## MAY v. CITY OF LARAMIE ET AL.

(No. 2223; November 24, 1942; 131 Pac. (2d) 300)

242

244

246

For the appellant there was a brief and oral argument by *G. R. McConnell* of Laramie.

248

For the respondents, there was a brief and oral argument by *J. F. Sullivan* of Laramie.

BLUME, Justice.

This is an action for a declaratory judgment, brought by plaintiff, a tax-payer, on behalf of himself and others similarly situated, to determine the status of the City of Laramie in this State in connection with the matters hereinafter mentioned. It is not necessary to set out the lengthy pleadings herein. The main questions involved are, whether, as contended by plaintiff, the legislative act creating cities of the second class, hereinafter mentioned, is unconstitutional, and whether, if it is, the fact that the City of Laramie has applied the provisions of the statute since its enactment, which is not questioned herein, has, as contended by the City, through custom and acquiescence, made it a valid law applicable to the city. Some questions are argued which, in view of our decision herein, need not be decided. The trial court held the contention of the City valid, and plaintiff has appealed.

The City of Laramie was organized by a special charter of the legislature in 1884. Its provisions are

now contained in Section 22-1801 to 22-1840, Rev. St. 1931. It has not elected to abandon its charter. Pursuant thereto annual elections must be held on the first Tuesday in April each year, for the purpose of electing a mayor, councilmen, a city treasurer and a city clerk. Two councilmen are directed to be elected in each the first and the second wards, each to hold office for two years, but elected in alternate years. One councilman is elected annually from the third ward. The mayor, city treasurer and city clerk are each elected for one year. Vacancies in the office of the mayor and council are to be filled by special elections, vacancies in the offices of city clerk and treasurer are to be filled by the mayor by and with the consent of the council. The salaries of various officers are to be fixed by ordinance, not to exceed certain amounts specified.

■ The legislature of this state has up to this time provided for only two classes of municipal corporations by general law. Provision for the organization, government, powers and restrictions of towns with a population of 300 (later reduced to 150) was made by territorial laws. These, with some amendments, are now found in Sections 22-1401 to 22-1453, Rev. St. 1931. In 1895, the legislature enacted a general law for the organization, government, powers and restrictions of municipalities with a population of 4000 or more, the first section providing that "all cities having more than four thousand inhabitants shall be governed by the provisions of this article, and be known as cities of the first class." Sections 1587 to 1672, Rev. St. of 1899. These laws were extensively amended in 1907, and are now contained in Sections 22-301 to 22-419, Rev. St. 1931.

In 1897 the legislature enacted a statute relating to cities with a population of 5000 to 8000, anomalously calling them cities of the second class. The act, as amended in 1901, is now contained in Sections 22-1101

to 22-1112, Rev. St. 1931. The title of the Act was "An Act to reduce the expenses of municipal government in cities of the second class, as herein defined." Section 15 of the Act, not shown in the Revised Statutes of 1931, was as follows:

"It is the intent and object of this act to reduce the expenditures of cities of the second class as defined herein, by decreasing the salaries of the officers thereof, by abrogating all provisions for special elections to fill vacancies in office, by dispensing with annual city elections and providing for biennial city elections, by decreasing the cost of city elections, and by reducing expenses in said cities in other respects as mentioned in this act."

Section 1 of the Act provided as follows:

"For the purposes of this act, all incorporated cities in this state, whether incorporated under a general law or special act, having a population of five thousand or more and less than eight thousand, according to the census taken last preceding, under the authority of the United States of America, or of this state, shall be cities of the second class. The said cities of the second class as defined by this act shall be hereinafter referred to and designated as 'said cities' or 'said city.' "

This section was amended in 1901 by changing the terms 5000 to 8000 to the terms 6000 to 9000. The statute is limited in its scope, providing, in the main, merely for salaries of officials, elections, abolishing special elections and filling vacancies in office, and fails to provide a general and comprehensive scheme for the organization and government of the cities purported to be covered. Under the act, municipal elections are held at the time of the general election in November; officials elected take office the following January; the mayor is elected for two years, councilmen for four years, half of them being elected at one election, the other half at the succeeding one. Officials other than

mayor and councilmen are appointive. Salaries are different from those provided by the special charter.

The constitutional provisions applicable herein are Sections 1 of Article XIII and 27 of Article III, of the Constitution. Section 1 of Article XIII is as follows:

"The legislature shall provide by general laws for the organization and classification of municipal corporations. The number of such classes shall not exceed four (4) and the powers of each class shall be defined by general laws, so that no such corporation shall have any powers or be subject to any restrictions other than all corporations of the same class. Cities and towns now existing under special charters or the general laws of the territory may abandon such charter and reorganize under the general laws of the state."

Section 27 of Article III, supra, provides in part as follows:

"The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * incorporation of cities, towns or villages; or changing or amending the charters of any cities, towns or villages; * * * the opening or conducting of any election; * * * creating, increasing or decreasing fees, percentages or allowances of public officers; creating offices or prescribing the powers or duties of offices in counties, cities * * *. In all other cases where a general law can be made applicable, no special law shall be enacted."

Section 34, Article I, provides that "all laws of a general nature shall have uniform operation."

It was held in McGarvey v. Swan, 17 Wyo. 120, 96 Pac. 697, that the provision of Article XIII, Section 1, supra, to the effect that the powers of the same class of cities must be the same, does not apply to cities operating under a special charter, but only to cities organized under general laws. Section 22-1101, supra, relating to cities of the second class, made the act, however, applicable to both classes of cities. Since, under

our statutes, cities organized under the general laws, with a population of 4000 or over, are cities of the first class, the Act in question here, making special provisions for cities with a population of 6000 to 9000, attempts to create a class within a class. Clearly, therefore, the statute is in violation of Sec. 1, Article XIII, supra, in so far as cities organized under the general laws are concerned. State v. Sheldon, 29 Wyo. 233, 213 Pac. 92, 96; McFarlane v. Cheyenne, 48 Wyo. 86, 42 P. (2d) 413. Unless, accordingly, we can hold that notwithstanding the invalidity of the legislative act as to these cities, it may be upheld as to cities under special charter, the whole act must fall. That question was discussed at considerable length in the two cases just cited. We are in doubt on the point, and prefer to rest our decision herein on other grounds, and for the purpose of this case consider the Act in question as applying only to cities with a special charter.

Section 27 of Article III of the Constitution, already quoted from, prohibits the passage of special or local laws. These provisions apply to cities acting under special charter as well as to others. McGarvey v. Swan, supra; see also 59 C. J. 762. It is asserted in the brief of counsel for appellants, and is not controverted, that the act providing for cities of the second class was enacted solely for the benefit of the City of Laramie. The act, as originally enacted in 1897, and the amendment thereto in 1901, were sponsored by members of the House from the county in which Laramie is situated. House Journal 1897, page 237; House Journal 1901, page 73. And Laramie has been the only city which has ever come within the purview of the statute or which has ever operated thereunder, and the general understanding that the Act was introduced solely for its benefit is, perhaps, partially due to these facts. The mere fact, however, that a statute applies, for the time being, only to one city, does not necessarily render it

unconstitutional as a special law (McGarvey v. Swan, supra), although the facts above stated may, doubtless, be taken into consideration in determining the constitutionality of the legislative acts in question. The legislature has the power to classify cities. McQuillan, Mun. Corp. (Rev. Ed.) Sec. 217; 59 C. J. 732; 37 Am. Jur. 709. And in McGarvey v. Swan, supra, this court held that cities with a special charter constitute a class by itself, recognized by the constitution, but as it were a large class, and that hence the legislature is not required to treat them all as a single and individual class, and may further classify them, as may be necessary, according to population, provided, that the law comes within the general rules relating to general, as opposed to special, laws. Classification based on population is a sufficient basis in many cases. However, "a sound and sufficient reason must appear for classification based on population, and arbitrary classification based on population cannot be sustained." McQuillan, supra, Section 222; 37 Am. Jur. 711; 12 Am. Jur. 169. Arbitrary selection can never be justified by calling it classification. Gulf etc. R. Co. v. Ellis, 165 U. S. 150, 159, 17 Sup. Ct. 255, 41 L. Ed. 666. In order to constitute a general law, as opposed to a special law, there must be some distinguishing peculiarity which gives rise to the necessity for the law as to the designated class. A mere classification for the purpose of legislation without regard to such necessity is special legislation condemned by the constitution. It is not what a law includes that makes it special, but what it excludes. Gandy v. Elizabeth City, 179 Va. 340, 19 S. E. (2d) 97. Hence, it by no means follows that a law is general because it operates upon all within a designated class. It is still special if it applies to all within a class without reason appearing why it is not made to apply generally to all. McQuillan, supra, Sec. 220; State v. Sheldon, supra. As stated in State ex rel. v. Hammer,

42 N. J. L. 435, approved in School City v. Hayes, 162 Ind. 193, 203, and in McGarvey v. Swan, supra: "There must be substantial distinction having a reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation, and the objects or places excluded. The marks of distinction on which the classification is founded must be such, in the nature of things, as will in some reasonable degree, at least, account for or justify the restriction of the legislation." McQuillan, supra, Sec. 221, states: "In determining whether a law is general or special, the court will look to its substance and necessary operation, as well as its form and phraseology. The effect of a statute, more than its mere form, or wording or phraseology, must determine its character as a public, general, special or local law. In brief, the question is, what in the ordinary course of events must necessarily be its operation and its effect." See also Dillon, Municipal Corporations (5th ed.) Sec. 142, who further states in Sec. 141 that "a classification which is not adopted in good faith tends to deprive the people of such slight notice as the recital of the name of the locality will afford them, and leaves them at the mercy of secret or disguised attempts to change municipal law. * * * At an early date courts recognized the fact that classifications not adopted in good faith, but with the purpose of evading the constitutional provisions, were inherently vicious in their tendency and should be repressed." We might add, that a distinction has been drawn between legislation of a general nature as distinguished from legislation municipal in character, and that the former class of legislation is invalid, if not applicable generally, even though it may apply to all cities of a particular class. Com. ex. rel. v. Fayette County Commissioners, 22 Pa. Dist. Ct. 654 and cases cited. Much, if not all, of the legislation in controversy

here, however, is of a municipal character, so that we need not investigate this point further.

In McGarvey v. Swan, supra, the court upheld a law, applicable to cities with a special charter having a population of 10,000 and over, upon the theory that the legislature may, or must, set the limit somewhere. It may be that if but one limit had been set in the enactment in question, we might have upheld it as valid. But it sets two limits, a minimum and a maximum, with the difference between these limits of a population of 3000. If we should uphold this enactment with such narrow confines, what should this court do if the difference between the minimum and the maximum were fixed at but 2000? What if only at 1000? The difficulties in such event which might confront the court in the future are apparent. In 1897 the limits were set at 5000 to 8000; in 1901 at 6000 to 9000. What rational difference was there between 5000 and 6000 on the one hand and 8000 and 9000 on the other, so far as the powers granted in the act are concerned? The truth probably is that the amendment was made because the population of Laramie under the census of 1900 slightly exceeded 8000. In Town of Longview v. Crawfordsville, 164 Ind. 117, 73 N. E. 78, 68 L. R. A. 622, the legislature passed an act giving cities between 6000 and 7000 population the power to annex territory. The court, holding the legislation to be special, and after stating the rule of law applicable, stated: "Applying these tests, it is evident that the classification in said act is merely arbitrary, and cannot relieve the same from the infirmity of being special and local. There is no reason inhering in the subject matter of the act for giving the power mentioned therein to cities of a population between 6000 and 7000 * * * and not giving the same to other cities in the state." In Sutton v. State, 96 Tenn. 696, the legislature passed a fence-law applicable to counties of a population between 30,000 and

34,000 and 55,000 and over. While declaring the law unconstitutional, also on other grounds, the court further said:

"Why should the law, with its burdens and its advantages, be made to apply to counties having a population of 30,000 and not to those having 29,900, 28,000 or 27,000? Why to those having 34,000, and not to those having 34,500, 35,000, or 36,000? Why to those having 55,000 and over, and not to those having 50,000, 52,000 or 54,000? Why to those within the narrow limit of 30,000 and 34,000, and not to those within the broader limit of 34,000 to 55,000?"

In Waybright v. Duval County, 142 Fla. 875, 196 So. 430, the court considered an act creating a civil service commission in counties with a population between 165,000 and 180,000. The court, holding the law invalid, stated:

"There must be a reasonable basis for a classification of this character, else the law will be declared a local one. * * * The civil service scheme is of comparatively recent origin and is a progressive step in the government of public affairs. Why it should be adaptable or practical in a county of 165,000 or 175,000 inhabitants, and of a lesser value of usefulness in one of 160 or 190 thousand persons is so difficult for us to understand that we entertain a reasonable doubt of its validity. It is impractical to draw a definite and distinct line of demarkation on one side of which some 'population statutes' may stand and others fall because of the variety or categories offered and subjects proposed, but must in each case hark back to the original rule of reasonable relationship. Our perusal of the briefs here and of the record, bearing in mind meanwhile the practical application of a civil service statute, and the apparently arbitrary figures adopted, leads us to the conviction that every reasonable doubt being resolved in favor of the soundness or validity of the act, still there is not a just relationship between the governmental plan and the population of the counties where it may be employed."

In Manatee County v. Davidson, 132 Fla. 656, 181

So. 889, a law fixing the salary of county officers in counties having a population between 20,000 and 23,000 was held to be local or special. In Caldo County v. Ry. Co., 155 Okl. 32, 7 P. (2d) 900, a statute providing for salaries in counties having a population between 41,000 and 51,000 was held to be a local law. The same result was reached in Thompson v. Stanley, 183 Okl. 445, 83 P. (2d) 386, under a statute which fixed the salary of county offices in counties having a population between 24,500 and 33,000 and an assessed valuation of 15 million dollars. In Herbert v. Mabry, 166 Tenn. 290, 61 S. W. (2d) 652, the court stated that "a law is partial and discriminatory that guarantees to an official $1200 a year and all fees in excess of the sum guaranteed in a county with a population ranging from 19,240 to 19,250, subsequently reduced to 15,139, to the exclusion of similar officials in fifteen or more counties with a population from 14,000 to 19,000." In Raymond v. Township Council of Teaneck, 14 N. J. Misc. 487, a statute providing for the continuance in office of assessors in cities having a population between 135,000 to 200,000, was held to be a special law. In many cases it is held that a classification based upon a trivial difference in population is invalid. 37 Am. Jur. 711; note 15 Ann. Cas. 857; State ex rel. v. York, 139 Fla. 291, 190 So. 599; Medders v. Stewart, 172 Ga. 507, 158 S. E. 56; In re Bucher, 162 Okla. 168, 20 P. (2d) 150.

None of these cases are exactly in point, nor can we say that the holdings of the courts are in entire accord on the subject, which, at best, presents many difficult questions, but the cases cited furnish ample illustrations of the general rule that a classification cannot be made without a reason therefor, and that there must be a substantial distinction between the places embraced in the legislation and the places excluded, and these cases help to guide us in arriving at a proper conclusion herein. It is not necessary to examine the

legislative act in question in all of its details. It will be sufficient to examine its main features. That there is no rational basis for the provisions for salary fixed in the act is evidenced by the legislative acts themselves. In 1897 the legislature thought that the same salaries which in that year were held to be proper for cities of 5000 to 8000 population were, in 1901, held to be proper, and proper only, for cities of 6000 to 9000 population. We know of no change in the economic conditions between these years which would have justified the change, and it is apparent, we think, as we stated before, that the amendment of 1901 was made solely by reason of the fact that the population of Laramie in 1901 exceeded 8000. And it would seem that we may well take into consideration the thought of the legislature as to what is a reasonable or arbitrary classification in this connection, expressed in a nearly contemporaneous enactment, namely, that relating to cities of the first class—presumably a general law— for officers of cities of the first class, in 1895. (Sec. 1603, Rev. St. 1899). In that class of cities, with a population which might be merely 4000, the mayor was authorized to receive a salary of $500 per annum; in the act of 1897, creating cities of the second class from 5000 to 8000—later 6000 to 9000—he could receive but $200 (Sec. 1674, Rev. St. 1899) ; in the former the clerk could receive $1200 per annum; in the latter but $350; in the former the city attorney could receive $750 per annum; in the latter but $300; in the former, the marshal could receive $1200 per annum; in the latter but $1000. These salaries, thus fixed by the enactment of 1897, were changed by amendment of the enactment in 1931, namely, Ch. 3 of the Session Laws of that year, but the vice inhering in the original enactment was not cured. See 59 C. J. 854-856. In fact, comparing these salaries with those in other cities, the special character

of legislation for cities of the second class is but emphasized.

In view of our constitutional provision against special or local legislation, it would seem that there is little justification in giving cities which operate under the same or substantially the same form of government, and of similar population, different *powers* in connection with the subject of salaries. That does not mean that the scale of salaries actually paid to the various officials in the different cities of approximately the same population must be the same. We think that there is nothing in the constitution which prevents the legislature from enabling municipalities, by giving them power of local self-government, to fix these salaries to suit their conditions, within the limitations hereinafter mentioned. Laramie apparently has wanted, or wants, to pay smaller salaries than other cities similarly situated, and we see no reason why that may not be done under a general law of the character above indicated. The framers of the statutes relating to second-class cities, here in controversy, perhaps thought that these salaries must be fixed in definite amounts by the legislature under Section 1 of Article XIV of the Constitution. The laws made for second class cities, herein condemned, are the only laws, made for cities, so far as we know, which have fixed these salaries in definite amounts. In most cases only the maximum has been fixed, and we think that sufficient, as intimated in State v. Sheldon, supra. Section 1 of Article XIV, supra, provides:

"All state, city, county, town and school officers (excepting justices of the peace and constables in precincts having less than fifteen hundred population, and excepting court commissioners, boards of arbitration and notaries public) shall be paid fixed and definite salaries. The legislature shall, from time to time, fix the amount of such salaries as are not already fixed by

this constitution, which shall in all cases be in proportion to the value of the services rendered and the duty performed."

We have examined the Journal of the Constitutional Convention, and do not find that the subject of salaries for officials of municipalities was ever discussed or even mentioned. There was a considerable amount of discussion in connection with salaries for county officers, particularly the sheriff. It is, perhaps, rather strange that in the section above mentioned, the constitutional convention made identical provisions for cities and towns as for county officials. The fact that all officials should be paid a definite salary is understandable. But the reasonableness of the remainder is not clear. All members of the legislature are, or should be, interested in the salaries of county officials, but members of the legislature from rural communities could hardly be expected to be interested in the salaries paid to officials in cities and towns. The reason for the provision lies, perhaps, in the fact that at that time all municipalities of any size were then operating under special charter, which made provision for salaries. However that may be, one thing is clear: the convention desired fixed salaries instead of fees to be paid to all officials. This appears in the first part of the section of the constitution above set out. That, of course, if permitted, may be done by ordinance of municipalities. The second part of the section provides that the legislature shall from time to time fix the salaries "as are not already fixed by this constitution." Ordinarily—and we confine this decision to officials in municipalities—if the legislature fixes the rule under which the compensation is to be fixed, that is sufficient. 12 C. J. 862; 15 C. J. 498; 16 C. J. S. 405; 20 C. J. S. 918. The constitution in Ohio provided that "the general assembly, in cases not provided for in this constitution, shall fix the term of office and the compensation of all

officers" etc. It was held that this did not require the fixing of definite amounts, but the fixing of a rule by which the compensation was to be determined. Crickett v. State, 18 Ohio State 9, 21. That, too, was the holding under similar constitutional provisions in Raynolds v. Board of Commissioners, 6 Ida. 787, 59 Pac. 730; Brooklings County v. Murphy, 23 S. D. 311, 121 N. W. 793. Our constitution mentions "amount" instead of "compensation." Still, we think, a rule similar to that announced in these cases applies here, and we think that the constitution itself shows that. As we noted, Section 1, Article XIV, supra, provides that the legislature shall fix the amounts "not already *fixed in this constitution.*" If we turn to Section 3 of the same article of the constitution we discover what the constitution meant by *"fixing the amount."* It provides for the salaries of county officers "within the following limits," and then proceeds to fix the *maximum* amount. The constitution, accordingly, itself has substantially provided that fixing a maximum amount satisfied the provision that the legislature shall fix the amount. Doubtless, the legislature has the power to fix the minimum as well as the maximum amount, or a definite amount, but it is clear that, if the legislature fixes the maximum amount to be paid to municipal officers, that is sufficient, leaving to the municipalities the power to meet local conditions, fixing the definite amounts at a figure to meet them. And that conclusion is, we think, entirely reasonable. No reason, accordingly, exists why the city of Laramie could not meet its local conditions as to salaries under a general law.

Again, special elections to fill vacancies were abolished in the act in question, in order, as the act recites, to save expenses, and for the same purpose the general municipal elections were provided to be held every second year, in November, instead of annually in April, and provisions were made for the conduct thereof. The

purpose for which the enactment was passed may be considered to determine whether it is special or general. Handy v. Johnson, 51 F. (2d) 809. In 1897, the legislature thought these changes proper to be made in cities of 5000-8000 population; why, in 1901, were they thought proper only in cities of 6000-9000 population? What rational basis could possibly exist for this? It may be conceded that the purpose of saving expense was laudable, but that does not validate unconstitutional means. City of Dearborn v. Wayne County, 275 Mich. 151, 266 N. W. 304. And why laudable only for cities of 5000-8000 population in 1897, and later only for cities of a population of 6000 to 9000? The special charters of Rawlins, Sheridan and Buffalo, for instance, also provided for elections to fill vacancies and for annual elections in the spring of the year. If the saving of expense in that connection was necessary for Laramie, why not equally, or more, necessary in the smaller cities last mentioned?

The population in this state has up to this time been comparatively small, and the growth thereof in the municipalities has been slow, so that, doubtless, the legislature would be warranted in making its classifications in connection with legislation concerning them on narrower bases than would be justified in more populous states. Still the classification in the enactment under investigation, with its narrow confines, finds no justification. What was its purpose? The only city coming within its terms was Laramie. It had a population of 6328 in 1890 and a population of 8207 in 1900. The cities with a special charter were, aside from Laramie, Cheyenne, Evanston, Rawlins, Sheridan and Buffalo. Cheyenne in 1890 had a population of 11,690, and 14,087 in 1900, and the maximum limits of 8000 and 9000 were evidently low enough so that that city would, in all likelihood, never come within the terms of the enactment in question. The other cities with a

special charter had either in 1897 or 1901 but a small population, not exceeding 2000 by any large number, and the minimum limits of 5000 and 6000 were evidently high enough, in view of the slowness of the growth in population, so as to make it unlikely, for many years in any event, to grow to the size of Laramie. In fact, none of these cities ever have, during a period of over forty years, reached the minimum limit of 6000, except Sheridan, which abandoned its special charter in 1907 and organized as a city of the first class. If any of these cities, with a population less than Laramie, should by chance—looking on the point as of 1897 and 1901—grow rapidly, it might, by the time of the next census of the United States, reach the population of 5000 or 6000 or over, but it would but by the merest accident have a population within the narrow limits of 5000 to 8000 or 6000 to 9000. In the light of the conditions in this state, of which we take judicial notice (Booker v. Kansas City, 149 Kans. 696, 88 P. (2d) 1071), and the law relating to cities organized under general laws, it must have been apparent, when the enactments in question were passed, that they would, in the natural course of events, in all probability, and not looking into the too far distant future, apply to but one city in the state, namely, Laramie, and it would seem that there was a deliberate attempt to thus confine it. Resolving all reasonable doubt in favor of the constitutionality of the legislative act in question, we think we are constrained to hold that the act is a special and not a general law, in violation of the provisions of Section 27 of Article III of the Constitution, and hence void.

We must, however, make an exception to this conclusion. Section 22-112, Rev. St. 1931, is a separate enactment, and was passed by the legislature at its session in 1931. It provides that cities of the second class are authorized to employ such number of policemen and

firemen as may be provided by ordinance. This provision has not been brought into controversy in this case, and has not been argued in any way, and we, accordingly, express no opinion thereon. It is stated in 59 C. J. 757 that a law may be regarded as general, if a similar law is already in force in excluded localities. For the reasons mentioned, we have not investigated whether that statement is applicable in this case.

We should, perhaps, add a word. Nothing stated in this opinion must be construed as passing upon the validity of any statutes enacted for municipalities organized under the general laws of this state. In determining in such case as to whether a statute is general or special the provisions of Section 27, Article III must be construed in conjunction with Section 1 of Article XIII supra. Classification being expressly authorized by the latter section, if the powers granted and restrictions imposed are uniform as to each class, courts would, except, perhaps, in special cases, hesitate to declare a law to be special if the powers and restrictions of one class are different from those of another class, even though it might be thought that no particular reason for the distinction exists. See Sheldon v. State, supra. In State ex rel. v. Fleming, 147 Mo. 1, 44 S. W. 758, for instance, it was held that a statute providing for elections in cities of the fourth class is not a special, but a general law. See also 16 C. J. S. 903. In such case the constitution furnishes a guide, to some extent at least, as to what is proper and what is not. No such guide is furnished for municipalities with a special charter. But see Chandler v. Louisville, 277 Ky. 79.

Counsel for the city has not attempted to defend the enactment here in question as a general law, doubtless concurring with us that it would be impossible to do so. His contention that the city of Laramie may rest part of its power upon this enactment is based on a different theory. His argument appears to

be two-fold; first ,that under the special charter, the city of Laramie has the right to amend its charter by its own acts, and that, though the statute contemplates ordinances to that effect, formal action is not necessary, but that this may be accomplished through acquiescence, custom and usage; second, that, in any event, without reference to the statutory powers, such amendment to the charter may be effected through such acquiescence, custom and usage. We shall omit any consideration of the difference between formal and informal action, as that would not lead us far. Counsel bases his first contention on the provisions of Section 22-1819, Rev. St. 1931, part of the special charter, which authorizes the city to enact, ordain, alter, modify or repeal any and all ordinances not repugnant to the laws of the state, *"and such as it shall deem expedient for the good government of the city,"* etc., and he contends that Laramie, under this provision, had the right to amend its own charter. He argues that "the city was not bound to adopt the laws set up for cities of the second class, but those provisions were similar to the ones they did wish to adopt. Therefore, about 1900 the mayor and council changed their time for holding elections and changed their charter provisions relating to salaries. They did not do this by formal action, at least no record can be found of the same, but did so by general custom and usage." Again, we find it stated that: "We do not feel that the city was bound by the laws governing cities of the second class, but that those certain provisions answering their purpose, and they adopted them at their own option as amendments to their original charter." The effect of counsel's contention seems to be that Laramie has the same powers, generally possessed by cities with a so-called home-rule charter. In accordance with that theory, while the city has followed the provisions of the enactment here in question as to salaries and as to the election and ap-

pointment of officers, it is freely admitted that as to the city clerk and the city treasurer, "neither the provisions of the special charter of the City of Laramie, nor the provisions of Chapter 22, Wyoming Revised Statutes of 1931 (providing for powers for cities of the second class) are followed."

The first contention herein is far-reaching. We need not say that would be true since the adoption of the constitution (see 37 Am. Jur. 635, 636; 16 C. J. S. 403), but at the time when the special charter was granted to Laramie, the legislature was not hampered by constitutional limitations, and it may be, without deciding it, that it had the power to grant a home-rule charter, at least as to matters of purely local concern. But did it do so? The charter granted to Cheyenne contains an identical provision (Sec. 22-1917, Rev. St. 1931), and the charter of Rawlins a provision nearly identical. Sec. 22-2016. No such power as here mentioned has ever been claimed by these cities, or by any other in this state. And it is perfectly clear that the claim is entirely new. It was evidently not made or considered valid when the statute for second class cities was enacted at the behest of members of the legislature from Laramie, as heretofore mentioned. Nor is the claim consistent with the mandatory provisions of the special charter. These provisions are that the elections *shall* be held at a certain time; that certain officials *shall* be elected, to hold for a specified time; that the salaries *shall* be fixed by ordinance, etc. There is nothing to indicate that these mandatory provisions may be modified by ordinance or by custom. Section 22-1819 does not give the city the power in so many words that it may pass ordinances inconsistent with the laws made by the legislature, nor does it do so by necessary implication, and in view of the general rule relating to powers of municipalities we think that the first contention above named cannot be sustained.

And we think that that is true also as to the second contention.

Our governments are—or at least have in the past been—built upon the theory of decentralization and local self-government, and it has been stated by a great writer on constitutional law that the system "is one which almost seems a part of the very nature of the race to which we belong," and that the rule against delegation of authority by the legislature is "qualified by the customs of our race, and by other maxims which regard local government." Cooley, Constitutional Limitations (8th ed.) 388-389. Notwithstanding this, the writer proceeds (page 391):

"The municipalities must look to the State for such charters of government as the legislature shall see fit to provide, and they cannot prescribe for themselves the details, though they have a right to expect that these charters will be granted with a recognition of the general principles with which we are familiar. The charter or the general law under which they exercise their powers, is their constitution, in which they must be able to show authority for the acts they assume to perform. They have no inherent jurisdiction to make laws or adopt regulations of government; they are governments of enumerated powers, acting by delegated authority, so that while the State legislature may exercise such powers of government coming within a proper designation of legislative power as are not expressly or impliedly prohibited, the local authorities can exercise only those which are expressly or impliedly conferred, and subject to such regulations or restrictions as are annexed to the grant."

We have heretofore given recognition to this rule. Whipps et al. v. Town of Greybull, 56 Wyo. 355, 109 P. (2d) 355; Lakota Oil & Gas Co. v. City of Casper, (Wyo.) 116 P. (2d) 261; Western Auto Transp. Co. v. City of Cheyenne (on rehearing), 120 P. (2d) 590. And see 37 Am. Jur. 720. Custom and acquiescence in the use of powers by a city may be considered in that

class of cases in which the terms of the constitution, or statutes, are not clear, but no further. Dillon, Mun. Corp. (5th ed.) Sec. 241. In such cases, they may be an aid in the construction thereof. The claim here made, that a municipality may, through its own acts, enlarge, change or diminish its powers, is wholly inconsistent with the rule that the powers of a municipality are derived from the legislature, nor do the authorities warrant the claim that acquiescence in a custom, in contravention of the constitution or statutes, creates an estoppel to challenge the powers of a city. The authorities are to the contrary. That no life could be injected into the unconstitutional statute here considered by custom or usage has been held by a number of authorities. State ex rel. v. Beacon, 66 Oh. St. 491, 64 N. E. 247, 90 Am. St. Rep. 599. In People v. Allen, 42 N. Y. 378, 384, the court stated that "no length of usage can enlarge legislative power, and a wise constitutional provision should not be broken down by frequent violations." In Sadler v. Langham, 34 Ala. 311, 334, the court stated that "it may be urged that these statutes have stood and been silently acquiesced in for so great a length of time, they should not now be disturbed. We are sensible of the force of this argument. It will be observed, however, that in Tennessee, the decision which declared the private road law unconstitutional was pronounced forty years after the enactment of the statute, and in New York after seventy years had elapsed. It is, perhaps, never too late to reestablish constitutional rights, the observance of which had been silently neglected." In Cooley's Constitutional Limitations (8th ed.) p. 150, it is stated that "Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the Constitution, and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised

for a long period in violation of the constitutional prohibition, without the mischief, which the constitution has designed to guard against, appearing, or without anyone being sufficiently interested in the subject to raise the question, but these circumstances cannot be allowed to sanction a clear infraction of the Constitution." See also State v. Stafford, 97 Mont. 275, 34 P. (2d) 372.

And this rule applies to statutes. Usage and custom have come under consideration in many cases. They are of importance mainly in connection with business and trade, when no definite rule of law governs the situation. See discussion in 25 C. J. S. 88 et seq. Sixteen centuries ago, the rule was announced that "an *ancient custom and long usage is of no mean authority,* but it shall not have the effect of contravening reason or the law." Code Justinian, 8, 52, 2. In 27 R. C. L. 164, stating the modern rule, it is said that "it is the well-settled general rule that in order that a custom or usage may be regarded as binding, it is essential that it be legal, and that a custom will not be recognized which is contrary to established law, inconsistent with good morals, or in conflict with the general public policy of the law." In State v. Stafford, supra, the court stated:

" 'It is elementary that a custom cannot vary the terms of, or operate to abrogate or repeal, a general statute.' Ettien v. Drum, 32 Mont. 311, 80 P. 369, 370. 'A course of practice founded upon a mistaken construction of a statute cannot have the force of law, no matter how long it has continued, unless there be a reasonable doubt as to the meaning of the particular provision upon which the practice is founded. Contemporaneous construction cannot abrogate a plain provision of law, or fritter away its obvious sense." State ex rel. Robinson v. Clements, 37 Mont. 100, 95 P. 845, 846. The specific provisions of the law furnish the

guide, and not usage and custom. State ex rel. Broadwater Farms Co. v. Broadwater Elevator Co., 61 Mont. 215, 201 P. 687."

Note 65 A. L. R. 811 deals with a kindred subject and states that "it is a generally accepted rule that usage or custom cannot be availed of to enlarge the statutory powers of a public officer to include acts otherwise unauthorized or contrary to established law." If a custom, though long continued, is, nevertheless, void, if contrary to law, it would seem to follow as a corollary that acquiescence therein cannot create an estoppel to question on the part of proper parties. Vial v. Paradise, 44 Idaho 157, 255 Pac. 643, 53 A. L. R. 191. "No estoppel" states 31 C. J. S. 408, "ordinarily results from acquiescence in the violation of law." In 31 C. J. S. 419 it is stated that "ordinarily the public may not be estopped by the unauthorized, illegal * * * conduct of its officers and agents." No question is raised herein that the plaintiffs are not the proper parties to bring this action. See 44 C. J. 1423-1425 as to Taxpayers' suits. The rule above mentioned as to custom in violation of law is held applicable in connection with municipal charters. 25 C. J. S. 91; Lawson, Usages and Custom, Sec. 224. In England, custom and usage in municipalities seem to have played a more important part than in this country. Dillon, Munic. Corp. (5th ed.) 240. But even there it has been held that an election held pursuant to a custom, but contrary to the provisions of the charter, is void. Powell v. Regina, 2 Bro. P. C. 298, 1 Eng. Rep. 956 (1728). And so, an election held pursuant to a by-law inconsistent with a charter was held void. Tucker v. King, 2 Bro. P. C. 329, 1 Eng. Rep. 960 (1728). In Rex. v. Selway, 9 Barn. & Cress 424, 109 Eng. Rep. 158, the court stated "a usage not inconsistent with a charter nor repugnant to it, may continue, notwithstanding the acceptance of a charter, but a usage repugnant to the

charter cannot." See also Haddock's Case, T. Raym. 435, 83 Eng. Rep. 227. Dillon, supra, Sec. 240, states that "usage in this country has a much more limited operation than in England. It is a necessary result of the manner in which our municipal corporations are created—viz., by express legislative act wherein their powers and duties are wholly prescribed—that the powers themselves cannot be added to, enlarged or diminished by proof of usage." And the cases in this country bear out this statement. Butler v. Charlestown, 7 Gray (Mass.) 12; Benoit v. Conway, 10 Allen (Mass.) 528; Concord v. Burleigh, 67 N. H. 106, 36 Atl. 606. See also 25 C. J. S. 91; Lawson, supra, Sec. 224; McQuillan, supra, Sec. 385. The case of State ex rel. v. Steunenberg, 5 Ida. 1, 45 Pac. 462, cited to us by counsel for the city, is not in conflict with these authorities. It merely holds that the method adopted for changing the charter of the city carried out the intention of the provisions made by the legislature.

Counsel for the city relies, in the main, upon authorities dealing with attacks on the *existence* of a municipal corporation. He quotes, for example, at length, from Section 63, Dillon, supra, where the author holds that acquiescence in the existence of a de facto municipal corporation will create an estoppel to question it. Unfortunately, counsel did not read far enough. We have already seen that the author, in Section 240, emphatically states that usage and custom cannot change or enlarge the powers of a municipality which are contrary to law. It would, of course, be strange that in a previous section his views would be exactly the contrary. It must be apparent to anyone that the author did not mean to contradict himself, but that in these respective sections he is considering two entirely different subjects. So, too, McQuillan, supra, who, in section 385, considering the subject of uses and custom, states that "abuses of power and violation of right,

derive no sanctions from time or custom," treats in sections 175 and 176 (cited by counsel for the city) of de facto municipal corporations, holding the same as Dillon, that acquiescence therein will create an estoppel to question it. The case of Henderson v. School District, 75 Mont. 154, 242 Pac. 979, too, treats of acquiescence in connection with a de facto public corporation. The subject of acquiescence in the existence of a de facto municipal corporation is one thing; the subject of acquiescence in the abuse of power, and the change or enlargement of powers of a municipality by usage and custom, is another. Carefully reading Dillon and McQuillan, treating of both subjects, will show that clearly. We do not say that if a city usurps powers which it does not possess, acquiescence and custom may not have some of the same consequences which follow acquiescence in the *existence* of a municipal corporation. For instance, we need not question that the present officials of the city, though they may have been elected or appointed irregularly, are de facto officials, and may hold their positions until their successors have been duly and legally elected or appointed, or that their past transactions and acts are legal and cannot now be attacked. The rule stated by McQuillan, supra, section 176, would seem to apply, that "an officer appointed under an unconstitutional statute to fill an office, is a de facto officer, and his acts done prior to a judicial decision holding the statute unconstitutional are valid so far as they involve the interests of the public and third persons." Nor are any questions raised on these points by counsel for the plaintiff. And this opinion, so far as it is possible, is intended to be prospective, and not retrospective in its effect.

While it is not necessary for our decision herein, counsel for plaintiffs have urged us to pass on another point. They contend that since the legislature has not by direct words affected the special charter of

the City of Laramie, the only powers which it possesses are those specifically provided for in the special charter. There seems to be some diversity of opinion on that point. See 59 C. J. 751; McQuillan, supra, Sec. 360. Counsel have cited us to some Idaho cases: Boise City National Bank v. Boise City, 15 Ida. 792, 100 Pac. 93; Kessler v. Fritzman, 21 Ida. 30, 119 Pac. 692. These cases hold that the special charter of a municipality cannot, in so far as local matters are concerned, be amended by a general law. As a complement to this decision it is further held in that state that a special charter may be amended by a special act of the legislature if the amending act is germane to the contents of the charter. Butler v. Lewiston, 11 Ida. 393, 83 Pac. 234. Concerning these two points, the late Chief Justice Potter said, in McGarvey v. Swan, 17 Wyo. 120, 138, 96 Pac. 697, that:

"Unquestionably, the charter of a municipal corporation cannot, under the Constitution, be amended by a local or special law. It may, however, be amended in effect by a general law."

That case directly involved the question as to whether or not the special charter of Cheyenne was supplemented by a general law, and hence seems to have disposed of the contention on that point in any event. And a number of cases have specifically held that special charters may be amended by general laws. Rutherford v. Haddens, 82 Mo. 388; Rutherford v. Hamilton, 97 Mo. 543; Kelly v. Meeks, 87 Mo. 396; Davis v. Holland (Tex. Civ. App.) 168 S. W. 9; Parrish v. Wright (Tex. Civ. App.) 293 S. W. 659; Eichels v. Street Ry. Co., 78 Ind. 261, 41 Am. Rep. 561; 37 Am. Jur. 636; McClure v. Natchez, 151 Miss. 718, 118 So. 616. See also 43 C. J. 155, 159; McQuillan, supra, Sec. 186 and Sec. 360. Many other cases give implied recognition to this rule. Not even municipalities with a home rule charter

are exempt therefrom so far as legislation may affect public as distinguished from local affairs. McQuillan, supra, Sec. 315. Hence, all legislative enactments in this state which apply to all cities and towns in this state and show the intent to apply them to cities with a special charter are applicable to the City of Laramie as well. It is not necessary herein to point out the specific statutes which may thus be applicable.

The judgment of the district court must, accordingly, be reversed. In the stipulation of facts it is stated that it is desirable that the court answer certain specific questions. It is not necessary to do so categorically. It is apparent from what we have said that except in those instances in which a general law is clearly applicable to Laramie, the city must operate under its special charter. That, for instance, is true with reference to the time of elections and with reference to salaries. Possibly the next legislature may correct this situation. In any event, the city has the right, of course, to come under the general laws of the state by complying with provisions of the statutes thereto. That, it is true, involves some inconveniences which we should have been glad to have saved the city if we could possibly have done so, but would, in the long run, be more than compensated by dispelling the uncertainty which, according to counsel, has long troubled the people of Laramie as to the powers of the city.

*Reversed.*

RINER, Ch. J., and KIMBALL, J., concur.