Tamara JOHNSON; Paul Radosevich; Jennifer Archibald; and Randy Hampton, Appellants (Petitioners),

v.

STATE of Wyoming HEARING EXAMINER'S OFFICE and the Division of Revenue and Taxation, Appellees (Respondents).

Garrett M. McCARTY and Donald C. King, Petitioners,

v.

Marvin APPLEQUIST, Charles Brown III, and Nancy Freudenthal, in their official capacities as Commissioners of the State of Wyoming Tax Commission; the State of Wyoming, ex rel., the Department of Revenue and Taxation; and the Honorable Stuart S. Healy, Justice of the Municipal Court, in and for the City of Sheridan, Wyoming, Respondents.

Nos. 90–297, 91–15.

Supreme Court of Wyoming.

Aug. 26, 1992.

Tony S. Lopez of Zimmers and Lopez, Laramie, and Christopher H. Hawks, Student Intern, for appellants in case No. 90–297.

Anthony T. Wendtland and Kate M. Fox of Burgess, Davis, Carmichael & Cannon and the American Civil Liberties Union, Sheridan, for petitioners in case No. 91–15.

Joseph B. Meyer, Atty. Gen., Mary Guthrie, Senior Asst. Atty. Gen., and Milo M. Vukelich, Asst. Atty. Gen., for appellees in case No. 90–297 and respondents in 91–15.

Before THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ., and BROWN, Retired J.

URBIGKIT, Justice.

For our constitutional review, these cases present 1990 legislation intended in part to enforce state and municipal alcohol nonconsumption provisions for persons under majority, age nineteen. In attempting to deter consumption, the statutes provide retributory punishment via driver's license suspension where the offense for which the punishment is inflicted involves neither driving nor motor vehicle use.

In these consolidated cases, the appellants claim that Wyo.Stat. §§ 31–7–126 and

* Chief Justice at time of oral argument.

31-7-128(f)(i) and (ii) (Supp.1990)[1] (license suspension statutes) are unconstitutional because they violate the equal protection and due process provisions of the state and federal constitutions, constitute cruel and unusual punishment, and represent constitutionally prohibited special legislation.

The appellants were less than nineteen years of age when convicted of possession or consumption of alcohol, apparently under city ordinance provisions restricting use or possession in non-public locations. The municipal courts sent the conviction records to the Department of Revenue and Taxation (Department) pursuant to Wyo. Stat. § 31-7-126 and the Department then suspended each driver's license for ninety days by direction of Wyo.Stat. § 31-7-128(f)(i) and (ii). In these appeals, we address issues that the Wyoming license suspension provisions violate the state constitution's guarantees regarding equal protection and due process, special legislation, cruel and unusual punishment, and double jeopardy. To support their arguments, appellants contend, among other claims, that the license suspension statutes violate even the minimum scrutiny test of equal protection. We agree and hold that Wyo.Stat. §§ 31-7-126 and 31-7-128(f)(i) and (ii) have several bases for invalidity by offending the protections guaranteed within the state Bill of Rights included in the Wyoming Constitution. *State ex rel. Wyoming Ass'n of Consulting Engineers and Land Surveyors v. Sullivan,* 798 P.2d 826 (Wyo. 1990); *Hoem v. State,* 756 P.2d 780 (Wyo. 1988).

## I. ISSUES

Tamara Johnson (Johnson), Paul Radosevich (Radosevich), Jennifer Archibald (Ar-

chibald), and Randy Hampton (Hampton) state the following claim:

Wyoming Statute § 31-7-128(f)(i) [and] (ii) [are] unconstitutional because the punishment is excessive and disproportionate to the penalty imposed in similar cases and the statute discriminates against Petitioners based on their age and the statute constitutes special legislation.

Garrett McCarty (McCarty) and Donald King (King) raise the following issues:

A. Do W.S. 31-7-126 (Cum.Supp. 1990) and W.S. 31-7-128(f) (Cum.Supp. 1990) violate the United States Constitution by denying Appellants equal protection of the laws?

B. Do W.S. 31-7-126 (Cum.Supp. 1990) and W.S. 31-7-128(f) (Cum.Supp. 1990) violate the Wyoming Constitution by denying Appellants equal protection of the laws?

C. Do W.S. 31-7-126 (Cum.Supp. 1990) and W.S. 31-7-128(f) (Cum.Supp. 1990) deny Appellants due process under the United States Constitution because they are vague?

D. [Do] W.S. 31-7-126 (Cum.Supp. 1990) and W.S. 31-7-128(f) (Cum.Supp. 1990) deny Appellants due process under the Wyoming Constitution because they are vague?

E. Do W.S. 31-7-126 (Cum.Supp. 1990) and W.S. 31-7-128(f) (Cum.Supp. 1990) constitute cruel and unusual punishment under the Wyoming Constitution?

## II. FACTS

The Wyoming legislation separates the people of Wyoming into three groups re-

---

1. Wyo.Stat. § 31-7-126 provides, in part:
 Each court in this state shall also forward to the [Department of Revenue and Taxation] within two (2) working days from the date of conviction a record of the conviction of any person under nineteen (19) years of age in the court for a violation of any law regarding the possession, delivery, manufacture or use of a controlled substance or alcohol.
 Wyo.Stat. § 31-7-128(f) provides:
 Upon receiving a record of the conviction of a driver who is under nineteen (19) years of age

for violating any law regarding the possession, delivery, manufacture or use of a controlled substance or alcohol, the [Department of Revenue and Taxation] shall suspend the license or nonresident operating privilege for:
 (i) Ninety (90) days for the first conviction;
 (ii) Six (6) months, if the person has been previously convicted within the preceding twelve (12) months for violating any law regarding the possession, delivery, manufacture or use of a controlled substance or alcohol.

garding the use or possession of alcohol and other controlled intoxicants. The first group is made up of persons who are at least twenty-one years old. These people may normally possess and ordinarily use alcohol legally (*see, however,* Wyo.Stat. § 12–5–502 (Supp.1992), "Liability for sale to child, ward or habitual drunkard when written notice thereof given"), but not "controlled substances." The second group is made up of persons who are either nineteen or twenty years old. These people may not use either alcohol or other controlled intoxicants legally, but if they are convicted of illegal use or possession, they will not lose their driver's licenses.[2] The third group is made up of persons who are less than nineteen years old. They too may not use any intoxicants legally, or at least not in a public place. Wyo.Stat. § 12–6–101(b) (Supp.1992). Unlike the other groups, however, any member within this category will have his or her vehicle driv-ing rights suspended if convicted of any disassociated offense *for violating any law* involving either legalized alcohol or illegal drugs.[3] Wyo.Stat. § 31–7–128(f); Wyo.Stat. § 31–7–120(b) (Supp.1991).

These appeals chronicle the current national examination of the use of alcoholic beverages by the younger members of our society as a constituent factor within this country's crisis of misuse of intoxicants by persons above a minimal level of perhaps age twelve and continuing thereafter through all age groups, but not necessarily notable for those past the age of 100. First addressed through the pressure of national legislation was the age of legal drinking which was raised by the Wyoming legislature to age twenty-one following threatened loss of federal funding by 1988 Wyo.Sess.Laws ch. 44, § 1. The 1990 enforcement legislation, 1990 Wyo.Sess.Laws ch. 92, § 1, since amended by 1991 Wyo.

---

**2.** Since a person of the age of nineteen or older can own a liquor store and can serve alcoholic beverages under Wyoming state law, it is incorrect to say that persons of this age cannot "possess" alcoholic beverages. It might be illegal to possess publicly with intent to use yourself, but not to sell to someone above the age of twenty-one. Wyo.Stat. §§ 12–4–103 and 12–6–101 (Supp.1992). However, for persons within the second age group, conviction of a combination offense involving both possession to furnish and concurrent use of a motor vehicle can result in a driver's license revocation and automobile registration suspension. Wyo.Stat. § 12–6–102 (Supp.1992).

**3.** Wyoming has an interesting array of offenses for minors relating to alcoholic beverages.

First, possession or being under the influence on a public road and highway or public place is included, but not if in a private place, Wyo.Stat. § 12–6–101(b), with an exception to the inclusion of a) when delivering within employment; b) in the presence of a parent or legal guardian; or c) dispensing or serving if eighteen years of age.

What is not a street, highway or public place is not defined in the statute and there is no criminal prohibition under state law against a parent furnishing alcoholic beverages to his or her child. However, no one else can. Wyo. Stat. § 12–6–101.

The subject abounds in ambiguities and complexities including what is a *law* to trigger the driving disassociated alcoholic offense, what is a conviction, and can the city ordinance render illegal what is legal under state law, *e.g.*, non-public use, possession or consumption in the private home or within a ceremonial circumstance or even when furnished by a parent. None of the present appellants were convicted of the violation of any state statute regarding use or possession of alcoholic beverages. Although anyone over the age of nineteen (majority) can own a liquor license, he or she cannot use the product sold. Wyo.Stat. §§ 12–6–101(a) and 12–4–103(a)(vii). To magnify the complexities, a further unanswered question exists when a bond is forfeited within the statutes where a bond-out nonappearance is only defined as a conviction for a driving offense.

Two concurrent newspaper stories are illustrative. One headlined *Novello: Laws let teens get liquor,* Casper Star–Tribune, Sept. 12, 1991, at A2, stated:

State laws intended to prevent minors from drinking are "riddled with loopholes" that make it easy for teenagers to buy and drink alcoholic beverages, Surgeon General Antonia Novello said Wednesday.

"The federally mandated, 21-year-old minimum age drinking law is largely a myth," the surgeon general said[.]

It was further stated in the second article, *Wyo law has loopholes,* Casper Star–Tribune, Sept. 12, 1991, at A2: "Consumption by minors is not specifically illegal in 21 states: * * * [including] Wyoming[,]" since according to the national press releases of the Surgeon General and the Health and Human Services Office of Inspector General, minors can sell and serve alcohol without adult supervision. *See however,* Michael P. Rosenthal, *The Minimum Drinking Age for Young People: An Observation,* 92 Dick.L.Rev. 649 (1988).

Sess.Laws ch. 233, § 1 was another effort to bring abstinence to our youth under the age of nineteen, but not to be applied to those older than nineteen and under the federally mandated minimum age of twenty-one.[4]

The present statutory provisions for these minor in possession or use driver's license suspension provisions are derived from acts of the legislature in two separate sessions. The initiating law was 1990 Wyo. Sess.Laws ch. 92 and the source of the litigation now pending. That statute was amended by 1991 Wyo.Sess.Laws ch. 233 which was enacted to remove the car insurance cost impact factor from the suspension provisions. *See* Wyo.Stat. § 31-7-120(b).

The historical derivation of these statutes is not provided by any record presently available to this court. Whether the Legislative Service Office has any documentation which could be judicially noticed is not presently disclosed as an origin state or authoritative basis for the legislation. There are five states found which have statutory tie-in provisions of the same general characteristics, but none are similar in terms to provide an operational system for revocation such as is found in the Wyoming statutes.

The statutes have dual provisions. Wyo. Stat. § 31-7-108(b)(vii) (Supp.1991) provides that if a person under the age of nineteen years "has been convicted of *any offense regarding the possession, delivery, manufacture or use of * * * alcohol within the preceding twelve (12) months"* they shall not secure the issuance or renewal of any driver's license. (Emphasis added.) Wyo.Stat. § 31-7-128(f) provides that any person under the age of nineteen years convicted of *"violating any law"* regarding the possession, delivery, manufacture or use of * * * alcohol" shall result in the

Department's suspension of any existent driver's license or nonresident operating permit. (Emphasis added.) The mandatory and automatic suspension period as action of the administrative agency licensing division is ninety days for the first conviction and six months for a second conviction within the preceding twelve months. *Id.*

1990 Wyo.Sess.Laws ch. 92 became effective July 1, 1990 and the following 1991 legislative session provided singular and significant reaction. Filed to amend or rescind the law were S.F. 2, S.F. 32, S.F. 60, S.F. 85, S.F. 100, S.F. 148, and S.F. 160, Dig. of S.J., 51st Leg., Gen.Sess. (Wyo. 1991). The House bill which generically touched the same issue was an age of majority bill, H.B. 118, Dig. of H.J., 51st Leg., Gen.Sess. (Wyo.1991).

Principal legislative direction was addressed by S.F. 160 sponsored by state Senator Tom Kinnison of Sheridan County, Wyoming. The purpose of the bill was to delete alcohol from coverage within the legislation and leave only controlled substances subject to the vehicle license suspension provisions. An amendment was added to the bill to remove the effects on automobile insurance availability and cost. The bill passed in the Senate with a vote of twenty-three to seven and passed in the House with a vote of forty-four to twenty. The Governor vetoed the bill and an override succeeded in the Senate by a vote of twenty-one to nine but failed in the House with a vote of thirty-six to twenty-eight.

With veto override failure of S.F. 160, S.F. 2 was pulled out from pending joint conference status and restructured by Joint Conference Committee No. 2 to serve two purposes. First, to affect its initial purpose to increase the reporting time by the original court of an alcohol related conviction from two days to ten days and, second, by the late stage amendatory pro-

---

**4.** The 1988 act which was passed by the Wyoming legislature under the threat of loss of federal highway funding and other grant and aid funds provided, in part: .

All amendments to the statutes of Wyoming made by this act are hereby repealed, and the statutes are restored and reenacted as they were before the amendments made by this

act, if Congress repeals Title 23, Section 158 of the United States Code.

1988 Wyo.Sess.Laws ch. 44, § 3. Overtly, if the federal threat to fund loss is hereafter removed, the minimum age restriction for use of alcoholic beverages would immediately return to persons "under the age of nineteen."

cess to insulate the fact of the teenager suspension from liability insurance carrier knowledge, policy revocation or premium escalation.[5] Dig. of S.J., 51st Leg., Gen. Sess. at 37 (Wyo.1991).

Within these consolidated appeals, we consider six young Wyoming citizens, resident in Sheridan and Laramie, Wyoming. Minimal documentation about the incidents or the individuals is provided by this record. McCarty, then age eighteen years and eleven months, and King, age eighteen years and six months, were arrested in a private residence for violation of a Sheridan City Ordinance which prohibited consumption of alcoholic beverages by a minor. After arrest, the two young men pled guilty and were sentenced for that offense.

The other four individuals, Johnson—born July 6, 1972, Radosevich—born August 8, 1972, Archibald—born May 25, 1972, and Hampton—born November 19, 1971, were all Laramie residents except Archibald who lived in Encampment, Wyoming, a rural community approximately 100 miles from Laramie. These four persons were at least eighteen years of age and the record does not indicate a common incident which caused their possession/use charges and convictions in the Laramie municipal court and subsequent driver's license suspension penalty. Clearly, motor vehicle use was not involved in the possession or use ordinance convictions. Although the dates of conviction differ, each of the four persons following appearance in municipal court received court punishment followed by a driver's license suspension by the Department which also required proof of insurance for the three years to be authenticated by an S.R. 22 insurance company filing.[6]

---

**5.** The enactment of S.F. 2 into 1991 Wyo.Sess. Laws ch. 233 includes several interesting facets. The bill, when initially introduced by sponsorship of the Joint Conference Committee, served the simple purpose of amending Wyo.Stat. § 31–7–126 to increase the court reporting time from two days to ten days. Introduction had been prompted by public outcry of the court system that the two-day time created a compliance impossibility. As enacted as Chapter 233, S.F. 2 was changed in addition to amend Wyo. Stat. § 31–7–126 relating to the notice time by adding a subsection to Wyo.Stat. § 31–7–120; creating a new subsection (e) for Wyo.Stat. § 31–7–128, and providing exceptions in Wyo. Stat. § 31–9–401 (Supp.1991) for the minor convicted of alcohol in possession/use offense as an exclusion for the reporting requirements under Wyo.Stat. § 31–7–128(f). It would take the wildest character of imagination to find compliance with Wyo. Const. art. 3, § 20: "No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose." The original purpose was to increase the notice time from the court and the ultimate purpose detailed permissive and non-permissive conduct of an administrative agency and further provided statutory premium limitation and cancellation restrictions for any automobile insurance policy as post-license suspension action that could be taken by insurance companies.

Another anomaly was created by 1991 Wyo. Sess.Laws ch. 233. The basic statute in 1990 Wyo.Sess.Laws ch. 92 related to two events for application: (1) Wyo.Stat. § 31–7–108, original issuance of a license to a minor; and (2) Wyo. Stat. § 31–7–128(f), suspension or revocation of a license following issuance. Other than the extended reporting time of Wyo.Stat. § 31–7–

126 which relates equally to issuance or suspension, Chapter 233 includes no provisions for non-issuance of a comparable nature as is now provided for suspension. Consequently the proposed amelioratory provisions of Wyo.Stat. §§ 31–7–120, 31–7–128 and 31–9–401 apply only to the Wyo.Stat. § 31–7–128(f) suspension and do not provide an equivalent benefit to a young person who is either an initial applicant or whose driver's license may come up for renewal. This equal protection question is actually not presented here since all of the appellants held licenses that were suspended and none were initial applicants. The broad issues of other constitutional concepts regarding premium increases or policy limitations or cancellations by the insurance carrier are also not presented since legislative passage of 1991 Wyo.Sess. Laws ch. 233 came after the events of this litigation had occurred and during the briefing time for these appeals. The legislative effort did remove a significant appellate issue, however, which addressed the major insurance costs and economic effect on the family of the suspended driver.

**6.** Apparently, the retroactively applied amendment inserted into the statute by 1991 Wyo.Sess. Laws ch. 233 was intended to eliminate the insurance cost difficulty initially created by the 1990 law. What this would have meant for these individuals is not clarified since the statutory change became effective while these appeals were pending in this court. Our reversal eliminates any requirement to address the issue.

The S.R. 22 filing is an insurance company form documenting its commitment to provide coverage as a liability carrier for three years subject only to cancellation for limited reasons,

### III. CONSTITUTIONAL ISSUES PRESENTED

■ We first examine state laws in light of the Wyoming Constitution because federal constitutional questions are avoided where legitimately possible, *Employment Sec. Com'n. of Wyoming v. Western Gas Processors, Ltd.*, 786 P.2d 866, 873 (Wyo. 1990), and because state constitutions "may be more protective of individual liberties" than the federal protections. *Cheyenne Airport Bd. v. Rogers*, 707 P.2d 717, 726 (Wyo.1985), *appeal dismissed* 476 U.S. 1110, 106 S.Ct. 1961, 90 L.Ed.2d 647 (1986). *See Westmark v. State*, 693 P.2d 220 (Wyo. 1984); *Washakie County School Dist. No. One v. Herschler*, 606 P.2d 310 (Wyo.), *cert. denied sub nom. Hot Springs County School District Number 1 v. Washakie County School District Number 1*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Nehring v. Russell*, 582 P.2d 67, 76–77 (Wyo.1978); William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 491 (1977); J. Skelly Wright, Commentary, *In Praise of State Courts: Confessions of a Federal Judge*, 11 Hastings Const.L.Q. 165, 188 (1984); and Shirley S. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Tex.L.Rev. 1141 (1985).[7] If state laws violate the Wyoming Constitution, then we need not examine their relation to the federal constitution.

In making this decision, we are also required to apply the "fundamental principle of constitutional interpretation that each and every clause within [the Wyoming] constitution has been inserted for a useful purpose." *Day v. Nelson*, 240 Neb. 997, 485 N.W.2d 583, 585–86 (1992) (involving

rejected legislative redistricting which did not follow county lines "whenever practicable").

#### A. *Equal Protection Under the Wyoming Constitution*

**Equality of all.**

In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are *equal*.

Wyo. Const. art. 1, § 2 (emphasis added).

**Equal political rights.**

Since *equality* in the enjoyment of natural and civil rights is only made sure through political *equality*, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or *any circumstance or condition whatsoever other than individual incompetency*, or unworthiness duly ascertained by a court of competent jurisdiction.

Wyo. Const. art. 1, § 3 (emphasis added).

"Equality, which was forthrightly proclaimed in the Declaration of Independence, but left out of the original United States Constitution under the pressure of the slavery question[8], is emphatically, if not repeatedly, set forth in the Wyoming Constitution." Michael J. Horan, *The Wyoming Constitution: A Centennial Assessment*, XXVI Land & Water L.Rev. 13, 21 (1991) (footnote omitted). *See also* Wyo. Const. art. 1, §§ 2 and 3; art. 3, § 27.

While the federal equal protection test of strict scrutiny appears designed to protect against the distinctions of race and color referred to in the Fifteenth Amendment, the test fails to protect equally against distinctions that are not specifically referred to in the Fifteenth Amendment. *See City of Cleburne, Tex. v. Cleburne Living*

---

including principally nonpayment of premiums. A major insurance cost increase results.

7. One of the most thoughtful and comprehensively presented analyses of use of the state constitution for protection in Wyoming of individual rights was provided in a paper presented by University of Wyoming Professor Robert B. Keiter, *Reflections on "Our Civil, Political and Religious Liberties:" Constitutional Law in the Late Twentieth Century*, Wyoming State Bar Convention (September 13, 1991). Professor

Keiter has a forthcoming book to be published (1/93 projected publication date) on the subject of Wyoming constitutional law.

8. The single reference to equal protection in the federal constitution is located in the first section of the Fourteenth Amendment. It may be that the equal treatment of citizens was considered a self-evident value not needing enumeration. If that is so, such a value may be located in the Ninth Amendment (Unenumerated Rights Clause).

*Center,* 473 U.S. 432, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). On the other hand, the Wyoming Constitution requires that laws affecting rights and privileges shall be without distinction of race, color, sex, or *any circumstance or condition whatsoever other than individual incompetency. See* Wyo. Const. art. 1, § 3.

 Because unambiguous constitutional language is to be read "so that each word or phrase has meaning and no part is superfluous," *Sanchez v. State,* 751 P.2d 1300, 1305 (Wyo.1988), the particular protections must be harmonized with other protective language. Wyo. Const. art. 1, § 3 also calls for the protection of *natural rights, State v. Langley,* 53 Wyo. 332, 342, 84 P.2d 767 (1938), and Wyo. Const. art. 1, § 36 requires that this court not construe the enumerated equal protection rights to deny or disparage other recognizable basic societal rights that could relate to equal protection. *See Nulle v. Gillette–Campbell County Joint Powers Fire Bd.,* 797 P.2d 1171, 1173 (Wyo.1990), protecting the right to associate with one's family under, inter alia, Wyo. Const. art. 1, § 36; *Western Gas Processors, Ltd.,* 786 P.2d at 872 n. 11, right to privacy located in Wyo. Const. art. 1, § 36; Robert B. Keiter, *An Essay on Wyoming Constitutional Interpretation,* XXI Land & Water L.Rev. 527, 563 (1986). Applying the rule of construction used in *Longfellow v. State,* 803 P.2d 848, 851 (Wyo.1990) and *Gezzi v. State,* 780 P.2d 972, 974 (Wyo.1989), Wyo. Const. art. 1, § 36 is construed to make the rights noted in Article 1 illustrative rather than exhaustive. *See* Lawrence G. Sager, *Rights Skepticism and Process–Based Responses,* 56 N.Y.U.L.Rev. 417, 441–42 (1981).

 Considering the state constitution's particular call for equal protection, the call to recognize basic rights, and notion that these particular protections are merely illustrative, the Wyoming Constitution is construed to protect people against legal discrimination more robustly than does the federal constitution. *See Herschler,* 606 P.2d 310 and *Nehring,* 582 P.2d 67. It is within this understanding that proper at-

tention can be provided to the factors involved in consideration of the constitutionality of a state law under the "minimum scrutiny" test. *See Sullivan,* 798 P.2d 826; *Hoem,* 756 P.2d 780; *Nehring,* 582 P.2d 67; and *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1354–55 (Wyo.1978). "[*Nehring v. Russell*] provide[s] a basis for arguing that equal protection review under the state constitution, even at the lowest traditional scrutiny level, empowers courts to scrutinize classification legislation more carefully than they can under federal doctrine." Keiter, *supra,* XXI Land & Water L.Rev. at 553. The race-sex based differentiation analysis used for federal constitution application involving a strict or heightened scrutiny for any law which attempts to distribute benefits or burdens because of race, color, alienage, sex, or illegitimacy is inadequate for protection against legislative discrimination based on any other characteristic other than individual incompetency, as required by the plain meaning of Wyo. Const. art. 1, § 3.

 While this court continues to require that "one who denies the constitutionality of a statute must establish that unconstitutionality," *Baskin v. State ex rel. Worker's Compensation Div.,* 722 P.2d 151, 155 (Wyo.1986), we can properly examine equal protection issues of the kind now presented based solely on calendar age in consistency with the approach long-advocated by Justice Stevens. The dominant value we now import into our former "minimum scrutiny" test is the relevance of an assumed characteristic of a group to a valid public purpose. "In [Justice Stevens'] equal protection lexicon, the requirement of *relevance* to a valid public purpose means that the characteristic or trait or behavior singled out to identify a group for legislative benefit or burden must 'provide a justification for treating [the members of the two classes] differently.'" Note, *Justice Stevens' Equal Protection Jurisprudence,* 100 Harv.L.Rev. 1146, 1154 (1987) (emphasis added). *See Cleburne Living Center,* 473 U.S. at 452–56, 105 S.Ct. at 3261–62. "Since his elevation to the Supreme Court in 1975, Associate Justice

John Paul Stevens has rejected the traditional multitiered method [of equal protection] and has articulated a separate vision of equal protection." Note, *supra*, 100 Harv.L.Rev. at 1146. The *"City of Cleburne v. Cleburne Living Center* demonstrates how Justice Stevens' approach avoids the dangers of the [Supreme] Court's implicit use of heightened scrutiny, without proliferating 'suspect' categories or overcomplicating an already complicated analytical structure." *Id.* at 1162 (footnotes omitted).

The Stevens' approach for constitutional review asks four questions when confronted with an equal protection issue. First, what class is harmed by the legislation and has that group been subjected to a "tradition of disfavor" by our laws? *Id.* at 1146. "That a classification disadvantages a traditionally disfavored class signals the likelihood that the classification is a product of stereotypical thinking." *Id.* at 1155. Justice Stevens uses this "tradition of disfavor" question "as a prophylactic to ensure that he is not confusing commonly shared prejudices with relevance." *Id.* at 1155 n. 47. Second, what is the public purpose that is being served by the law? Third, what is the characteristic of the disadvantaged class that justifies the disparate treatment? And lastly, how are the characteristics used to distinguish people for such disparate treatment relevant to the purpose that the challenged laws purportedly intend to serve?

■ It is against this backdrop that we examine the license suspension statutes. Preliminarily, we must identify the class at issue. Joseph Tussman and Jacobus tenBroek, *The Equal Protection of the Laws*, XXXVII Calif.L.Rev. 341, 344 (1949). The contested class is made up of those less than nineteen years of age and who are convicted of the illegal possession/use of alcohol or controlled substances.

We first look to the harm or burdens occasioned by the legislation and examine whether this group has been subjected to a tradition of disfavor. Unlike those between the ages of nineteen and twenty-one years, this group not only lost their driver's licenses but were faced with payment of substantially higher premiums for substantially reduced insurance coverage. As well, those under eighteen are "politically powerless" since they are deprived of the right to vote and thus unable to make legislators directly accountable for such disparate treatment. "[T]he judicial branch of government must recognize the interests of the politically powerless and speak for those interests in order to defend the concept of justice." *Hoem*, 756 P.2d at 787, Thomas, J., specially concurring. The practical approach and resulting conclusion in *Hoem* of both the majority and special concurrence are completely consistent with the disparate treatment constitutional analysis defined by Justice Stevens in *Cleburne*.

Second, what is the governmental purpose being served by the classification? While the statutes do not state a purported purpose, they are located under Title 31, ch. 7 of the Wyoming statutes which deals with driver's licenses. The appellants and the State both argue that the purpose is to deter drunk driving. We understand, then, that the asserted purpose is related to highway safety.[9]

Next, what is the characteristic of the group that justifies the disparate treatment as compared to those between nineteen and twenty-one years of age or compared to those who are older than twenty-one years of age? The argument advanced by the State to distinguish between those less than nineteen and those less than twenty-one "revolves around the degree of independence each class possesses." The State argues those persons who are less than

---

**9.** Although argued in detail, closer analysis reveals that the driving force behind enactments such as presented here is to enforce non-use of alcoholic beverages by persons under the age of nineteen unless in the presence of their parents. Fines or jail are not deemed adequate punishment; therefore, driver's license suspension is added to the inflicted deterrent. Realists know that the practical result is more frequent violations of driving without a driver's license and likely no significant reduction in drinking occurrences where groups of young people gather in the presence and for the use of alcoholic beverages. *See* n. 3, *supra*.

nineteen have traditionally been "subject to the rules that adults make for them." Aside from the circularity of this argument, the assumption that those who have had their driver's licenses suspended are more "dependent" than all those who are nineteen or twenty is no more than conjecture. Conjecture is not enough. Just as "any claim that the restriction of the law bears a reasonable relation to a public interest must rest not on conjecture but must be supported by something of substance," *Nehring*, 582 P.2d at 77, the characteristic ascribed to the group to justify the classification must also rest on more than conjecture. It is important to the understanding of equal protection not to confuse commonly shared prejudices with relevance. In light of decisions such as *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), in which Americans with Japanese ancestry were stripped of their property, forced from their homes, and concentrated in internment camps, American courts should be alert to be available to challenge both unfounded assumptions and unjustified prejudices.

How are the characteristics used to distinguish people for such disparate treatment relevant to the purpose that the challenged laws purportedly intend to serve? [10] Even if the State's assumption that those less than nineteen are less independent than those who are nineteen or twenty years old was accepted by this court, the State would still have to show the relevance of the characteristic to the restriction. This additional requirement that the record must justify a basis for believing that the distinguished group poses a special threat to the government's legitimate interest is now required by the United States Supreme Court's current minimum scrutiny test. *See Cleburne Living Center*, 473 U.S. at 446, 105 S.Ct. at 3258. Under this constraint, state courts are no longer free to imagine any set of facts which could make the statute appear constitutional. The records in these appeals contain no evidence from which this court can infer the relevance between suspending the driver's licenses of those less than nineteen years of age but not those nineteen or twenty to the purported purpose of improving highway safety or deterring the illegal use or possession of alcohol.

**B. *Uniform Operation of General Law and Special Legislation Prohibited***

**Uniform operation of general law.**

All laws of a general nature shall have a uniform operation.

Wyo. Const. art. 1, § 34.

**Special and local laws prohibited.**

The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: For [thirty-six enumerated special categories]. In all other cases where a general law can be made applicable no special law shall be enacted.

Wyo. Const. art. 3, § 27.

We are faced with a further question of a violation of the Wyoming Constitution provided through intrusion of Wyo. Const. art. 1, § 34 and art. 3, § 27, enunciating a uniform operation of the law structure and precluding special legislation as a Wyoming constitutional protection, respectively. Essentially, the challenged legislation is special legislation that lacks rational differentiation from persons age nineteen and twenty who are also denied the right to use alcoholic beverages constituting a similar class and, for that matter, those of any age whose excessive use makes their use illegal. This special legislation fits closely within the concepts we enunciated in defining the impermissibility of the classifications which were found in *Hoem*, 756 P.2d 780, to fail to meet the constitutional test.

We do not ignore the serious responsibility vested upon this court in determining that a solemn act of the legislature violates the Wyoming Constitution; nor, conversely, can we escape responsibility for the

---

**10.** It is only to state a fact that a significant number of young people in 1992 are enrolled in and attending institutions of higher education before they achieve majority (age nineteen in Wyoming, except for use of alcohol which is age twenty-one or voting, age eighteen) and have been driving since age fifteen, sixteen or seventeen. Wyo.Stat. § 31–7–110 (1989).

primary obligation vested upon the judicial branch of government included within our oath of office addressed to all governmental officials to support, obey and defend the Constitutions of the United States and of the state of Wyoming. When the judiciary abandons its responsibility to the constitutional directive, representative government can only continue within a short and inevitably terminative time span. Within this recognition, we assume for discussion the presumption of constitutionality which embraces all acts of the legislature, *Hoem*, 756 P.2d 780, and acknowledge that countervailing views do exist within this country relating to legislation which applies a punitive driver's license denial punishment to persons under a given age who join other segments of our society in the consumption of alcoholic beverages.

■ Following this court's decision in *Hoem* in persuasion and perspective, we would perceive noncompliance with these constitutional limitations in several specific characteristics. If the minor who purchases or uses is to lose driving privileges, the co-violating adult or the liquor vendor, Wyo.Stat. § 12-6-101, should similarly be subjected to the loss of his driver's license as is provided in the limited sphere of present law in using a motor vehicle to furnish or deliver. Wyo.Stat. § 12-6-102 (Supp. 1992). The loss of a driver's license for the use of alcohol cannot be distinguishably differentiated if illegal for individuals of the ages below nineteen and those between nineteen and twenty-one. Likewise, the "illegal" sale pursuant to Wyo.Stat. § 12-5-502, where non-approval is alleged, should similarly require driver's license suspension to the buyer and seller if a uniform operation of the constitutional requirement is to be provided. All illegal acts should expose miscreants within the same category of offense to the same kind of punitive responsibility and should not differentiate if the person to be punished happens to be under nineteen years of age.

Wyoming has a longstanding, thoroughly expressed and explicitly applied history in rejection of legislative efforts to enact special legislation. The three basic cases which predated *Sullivan*, 798 P.2d 826 and *Hoem*, 756 P.2d 780, were *Phillips v. ABC Builders, Inc.*, 611 P.2d 821 (Wyo.1980); *Nation v. Giant Drug Co.*, 396 P.2d 431 (Wyo.1964); and *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne*, 371 P.2d 409 (Wyo.1962). Similarly postured in constitutional application were *Bell v. Gray*, 377 P.2d 924 (Wyo.1963); *Pirie v. Kamps*, 68 Wyo. 83, 229 P.2d 927 (1951); and *May v. City of Laramie*, 58 Wyo. 240, 131 P.2d 300 (1942). Somewhere outside the mainstream of these legal inquiries, but certainly one of the most interesting cases regarding economic legislation in detail of text and comprehensive analysis, is *Langley*, 53 Wyo. 332, 84 P.2d 767.

With regard to an ordinance requiring certain businesses to close on Sunday, *Nation*, 396 P.2d 431; fair trade pricing enforcement, *Bulova Watch Co.*, 371 P.2d 409; statute of limitations for negligent construction, *Phillips*, 611 P.2d 821; proper classification of cities and towns for statutory differential, *May*, 58 Wyo. 240, 131 P.2d 300; size of newspaper for legal ad, *Pirie*, 68 Wyo. 83, 229 P.2d 927; and insurance agent licensing which excludes auto insurance, *Bell*, 377 P.2d 924, each and all should not be considered to be more narrowly drawn than driver's license rights of someone under the age of nineteen compared to another person age nineteen or twenty when both may have cadged a drink at a private party.

In philosophic overview, Chief Justice Blume outlined the perspective in his consideration of *Langley* as a case application of a statute relating to selling below cost with an opinion which essentially confirmed the statute and, by a split decision, destroyed its efficacy for any commercial and criminal application. *Langley* was not a special legislation constitutional examination, but directly considered police power limitations which we can now compare to the loss of right to use an automobile legally because of attendance at a private party where alcohol was consumed. We would do well to recall the gracious sweep and serious philosophy that Chief Justice Blume provided for Wyoming law in 1938.

The legislation now before us would probably not cause more than ordinary anxiety, or deserve greater consideration than the ordinary constitutional question, were it not for the times in which we live, the depression now existing, the unrest now prevailing, the mass of social legislation in the last few years, the wonder whither we are going, and the frequent queries whether courts are drifting merely with the tide or are rendering their decisions with that steadfast judgment as is their wont. Before discussing the direct questions involved herein, it may be well, even though resulting in the statement of seeming platitudes, to cast a hasty glance over the basic historic facts underlying constitutional law, and the fundamental principles which should govern it; also to make a brief analysis of judicial utterances in that connection, and give our own appraisal thereof. That will perhaps dissipate uncertainties and wavering doubts, lending us self-certitude in the correctness of our decision, and, we hope, affirm the faith and confidence hitherto placed in us by our fellow-men.

The Bill of Rights contained in the various constitutions, including our own, has its direct root in the ideas of the preceding centuries. Prior to the Renaissance prices of merchandise were freely regulated. It was not deemed improper to do so even in our colonies, including New York, New Jersey, Maryland and New Hampshire as late as the time of the Revolution. 28 Columbia Law Review 712, note. With the Renaissance began a new period in human history. Thoughts of liberty and freedom took possession of the minds of men, first in the field of religion, then of politics, later in the field of economics. It came to be a part of the legal philosophy of the times that each man has, as such, and because he is a human being, certain natural, inherent and indefeasible rights of which no government should, or has the right, to deprive him. One of the chief exponents of that doctrine was Rousseaux, writing in his Contract Social in the eighteenth century. See Leon Duguit in 31 Harvard Law Review 1–185. That doctrine was embodied in the Declaration of Rights of the French National Assembly in 1789 in which it is stated that the end of all union of men in society is the conservation of their natural and indefeasible rights of man, and in the French Constitution of 1791, which states that the legislative power cannot make any laws which infringe and interfere with these rights. Idem, 12, 17. The Contract Social of Rousseaux had its repercussions and its influence upon all modern doctrine of legal and political philosophy and Duguit states that "the principle of sovereignty limited by the rights of the individual is still dominant in French classical doctrine." Idem 114. Its influence in our own country during the 18th century may be noted in the writings of a contemporary. "The end of all political associations," writes Paine in his "Rights of Man" (Conclusion Part 1) "is the preservation of the natural and imprescriptible rights of man, and these rights are liberty, property, security and resistance of oppression." Liberty of production and exchange was proclaimed no less than political liberty. The "Wealth of Nations" of Adam Smith, e.g. wielded an enormous influence. To illustrate, Thomas Paine, in his work already mentioned, writes that "government is no farther necessary than to supply the few cases to which society and civilization are not conveniently competent * * *. The more perfect civilization is, the less occasion has it for government, because the more does it regulate its own affairs, and govern itself * * *. It is but few general laws that civilized life requires." Part 2, c. 1. That theory was naturally accentuated by reason of the existence and the development of our frontier, and the spirit engendered by that development has not lost all of its influence at the present time. The doctrine of natural and inherent rights to life, liberty and property was announced in the Declaration of Independence, in the constitutions of New Hampshire, Virginia, and Pennsylvania in 1776, in the constitution of Vermont in 1777, in that of Massachusetts in 1780, in

that of New Jersey in 1784. Other constitutions followed in the same vein. Section 3 of Article 1 of our own constitution refers to natural rights of man and section 2 of the same article provides that "in their inherent rights to life, liberty and pursuit of happiness, all members of the human race are equal." There are those who maintain that man has no natural rights; that none can exist except in society, and that whatever rights he has, he, accordingly, receives from society. However that may be theoretically, natural rights are recognized by our constitution. The doctrine is part of the positive law of the land, and section 6 of Article 1 of our constitution provides that no person shall be deprived of life, liberty or property without due process of law. The article evidently refers to the natural and inherent rights otherwise mentioned, and so it becomes apparent, particularly in view of the history above outlined, that the framers of the constitution meant that the protection thereof is important and that they, though loosely defined, should not be unduly invaded.

*Langley*, 53 Wyo. at 340–42, 84 P.2d 767.

Chief Justice Blume then recognized that the police power could serve as a limitation *on* constitutional rights, but that the police power could not be unlimited *in* its effect on those constitutional rights since due process is both substantive and procedural.

Nearly every law abridges individual freedom of action to a more or less extent. In nearly all instances when one is enacted, it gives rise, or may give rise, to a conflict between such freedom on the one hand, and the power of the legislature to abridge it on the other. The solution of the conflict is judicial in its nature. Courts must be, and are, whether willingly or not, the ultimate arbiters as to whether or not there is, in a particular case, an unwarranted invasion of the guaranteed rights above mentioned. 11 Am.Jur. 1087. They have found that solution,—the only one possible or just under the circumstances—in the standard of reasonableness. 6 R.C.L. 236; 11 Am. Jur. 1073–1074. That standard is indefinite. What is reasonable depends of the facts and circumstances. 11 Am.Jur. 1074; 6 R.C.L. 236, 239; 19 R.C.L. 807. Paine's thought that, as civilization progresses, men will more and more regulate their own affairs has not proved itself correct. Altruism has not proceeded that far. History is replete with the wreckage of rules of private law. It would be no less than surprising, if it were otherwise in the field of public law. As the number of people increases, as trade develops, as civic centers become crowded, as society becomes more complex, more and more problems arise which must be solved, and the freedom of movement and of action of the individuals must be harmonized with equal rights for all. That is not always easy to do. Certain rules have been laid down to help.

In order that a statute may be valid, the purpose, aim, or end thereof must be within the scope or purview of the police power, and in furtherance thereof; the means adopted must be reasonable and not arbitrary, and must be appropriate for the accomplishment of the end in view; in other words, there must be a substantial connection between the purpose in view and the actual provisions of the law.

*Langley*, 53 Wyo. at 343–44, 84 P.2d 767.

The test he stated, which is still completely appropriate and well-defined, was:

[I]f a statute reasonably tends to further such object, and is a fairly appropriate and reasonable means for that purpose under all the circumstances, then only the question of the wisdom of the law remains, which, in view of the purpose of the existence of the legislative department, should be left to it to determine.

*Id.* at 345, 84 P.2d 767.

*Langley* was followed by *Bulova Watch Co.*, 371 P.2d 409, where the fair trade law was found in violation of the Wyoming Constitution as offending the required due process protection and being beyond the police power of the state. *Nation* followed where a pure classification special legislation and non-uniform operation analysis re-

quired the court to void the Sunday no sale ordinance.

> [W]e think the conclusion inescapable that the ordinance is so permeated with unreasonable, arbitrary, capricious, discriminatory, and oppressive provisions that it cannot stand. The means adopted are shown to be without substance in accomplishing the end in view, as a legitimate exercise of the police power. It is directly violative of Art. 1, § 7 of the Constitution of this State, which provides:
>
> > "Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."
>
> The discriminations, under the guise of classification, are violative of Art. 1, § 34 of the Constitution of Wyoming, which provides:
>
> > "All laws of a general nature shall have a uniform operation."
>
> Under all of these circumstances we are constrained to hold that the trial court did not err in declaring the entire ordinance invalid when tested by constitutional safeguards.

*Nation*, 396 P.2d at 437.

In *Bell*, 377 P.2d 924, this court excised the exclusion of classes of insurance agents for being both discriminatory and arbitrary and, consequently, unconstitutional and void.[11] By deleting the exceptions, the court generalized the classification and created a constitutional application for the licensing statute. Likewise with regard to cities, this court observed that " 'a sound and sufficient reason must appear for classification based on population, and arbitrary classification based on population cannot be sustained.' " *May*, 58 Wyo. at 257, 131 P.2d at 306 (quoting McQuillan, Mun. Corp. (Rev.Ed.) Sec. 222; citing 37 Am.Jur. 711; 12 Am.Jur. 169 and variant case law).

In order to constitute a general law, as opposed to a special law, there must be some distinguishing peculiarity which gives rise to the necessity for the law as to the designated class. A mere classification for the purpose of legislation without regard to such necessity is special legislation condemned by the constitution. It is not what a law includes that makes it special, but what is excludes. * * * Hence, it by no means follows that a law is general because it operates upon all within a designated class. It is still special if it applies to all within a class without reason appearing why it is not made to apply generally to all. * * * As stated in *State ex rel. v. Hammer*, 42 N.J.L. 435, approved in *School City v. Hayes*, 162 Ind. 193, 203 [70 N.E. 134] and in *McGarvey v. Swan*, [17 Wyo. 120, 96 P. 697]: "There must be substantial distinction having a reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation, and the objects or places excluded. The marks of distinction on which the classification is founded must be such, in the nature of things, as will in some reasonable degree, at least, account for or justify the restriction of the legislation." McQuillan, supra, Sec. 221, states: "In determining whether a law is general or special, the court will look to its substance and necessary operation, as well as its form and phraseology. The effect of a statute, more than its mere form, or wording or phraseology, must determine its character as a public, general, special or local law. In brief, the question is, what in the ordinary course of events must necessarily be its operation and its effect."

*May*, 58 Wyo. at 257–58, 131 P.2d at 306.

In the terminology of *May*, we ask what difference in alcoholic offense punishment should be applied to the person who is not quite nineteen years old compared to the person who is? If the law is to provide some consistency and equality, it would be necessary to consider why the person who is more than nineteen years old should not

---

11. It would be excessive judicial legislation to apply a similar approach to create a driver's license revocation for each adult convicted of either alcohol or illegal drug "related" offenses. A bar room disturbance, for example, would achieve a far different status in Wyoming penology if loss of right to use a motor vehicle was to be included for the prospective punishment.

be similarly punished, since as an adult that person should know better particularly if a college social function might be involved. *See also Pirie*, 68 Wyo. 83, 229 P.2d 927, newspaper size requirement of 11″ x 18″ compared to 12″ x 19″ to publish a legal ad. One inch like one year or one day may create legislation special in scope and unconstitutional in application. The comparison follows since one inch in the size of newspapers had an operative factor in application to general classes of Wyoming published newspapers (and probably one specific newspaper publisher). In other words, the newspaper size law was intended to be discriminatory as are the driver's license suspension statutes involved in these appeals.

If age constitutes a proper function within special legislation concepts, we could equally consider driver's license suspension for child support nonpayment or state fees and tax delinquency cases involving adults. This subject was considered by an Illinois court addressing a driving privilege revocation statute effectuated by a sex offense conviction. The Illinois Supreme Court, while recognizing the strong presumption of constitutionality within the limited-rational basis standard of review, found the provision violated due process and was invalid. That court recognized that the stated purpose of any driver's license provision "is to ensure that drivers who have demonstrated they are unfit to safely operate vehicles are not allowed to drive." *People v. Lindner*, 127 Ill.2d 174, 129 Ill.Dec. 64, 67, 535 N.E.2d 829, 832 (1989). The court then stated the standard which is conceptually applicable to our review for this case:

> Having identified the public interest at stake, we next examine whether the statute bears a reasonable relationship to that interest. We readily conclude that it does not, and as we have noted, the State does not argue otherwise. Because a vehicle was not involved in any way in the commission of the offense for which defendant was convicted, the revocation of his license bears no relationship, much less a reasonable one, to the public interest we have identified. The

same is true of the other offenses enumerated in section 6–205(b)(2).

Moreover, the method used to further the public interest is not reasonable. Keeping off the roads drivers who have committed offenses not involving vehicles is not a reasonable means of ensuring that the roads are free of drivers who operate vehicles unsafely or illegally. To the contrary, the means chosen are arbitrary, not only because the offenses specified in section 6–205(b)(2) have no connection to motor vehicles, but also because the inclusion of those offenses and no others is arbitrary. That is, no reason suggests itself as to why the legislature chose the particular offenses enumerated in section 6–205(b)(3) [sic] as opposed to other offenses not involving a vehicle.

For these reasons, we hold that the challenged provision is an unreasonable and arbitrary exercise of the State's police power in violation of the constitutional guarantee of due process and is therefore invalid.

The State contends that under the rational-basis test, we are not limited by the statement of purpose found in the statute and may, indeed must, consider any conceivable basis for the challenged provision. Further, the State argues, in a somewhat circular fashion, as follows. This court's duty is to construe acts of the legislature so as to affirm their constitutionality and validity, if that can be reasonably done. * * * The State assumes *arguendo* that revocation of a sex offender's license is not related to the offender's fitness to operate a vehicle. Given that assumption, if we determine the statute's purpose only by reference to its stated purpose, we necessarily will find that the provision is unconstitutional. It follows, according to the State, that we must determine that the statute has purposes other than safety in order to fulfill our duty to uphold its constitutionality.

The State's argument is unpersuasive. In the first place, the rational-basis test, although a deferential standard of review, " 'is not a toothless one.' " (*Math-*

*ews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389, 394 (1976), quoted in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 439, 102 S.Ct. 1148, 1160, 71 L.Ed.2d 265 (1982), (Blackmun, J., concurring).) Second, our duty to uphold the constitutionality of legislative enactments is always subject to the qualification that we must do so if that can be reasonably done. It is no less our duty to strike down legislation that plainly violates the Constitution. Third, we have ascertained the purpose of the statute by considering not only the stated purpose—safe operation—but also the legislation as a whole.

But even if we consider the purposes identified by the State, the statute fails to pass constitutional muster. The first purpose identified by the State is punishment. As a preliminary matter, we will assume *arguendo* that revocation after conviction constitutes punishment, notwithstanding our decisions which have held that summary suspension of a license before a trial on the merits is an administrative function and not a punishment. * * *

We fail to see, however, how identifying the purpose as punishment cures the constitutional infirmity. The revocation of defendant's license would then be an additional penalty for a criminal offense, and the same rational-basis test would apply. * * * The penalty of license revocation bears no relationship to the offense. Moreover, if punishment is the purpose, the statute is arbitrary for the same reason we identified earlier. There is no rational basis for choosing the particular offenses in section 6–205(b)(2), as opposed to other offenses not involving a vehicle, to receive the punishment of revocation. If the legislature may punish these offenses with revocation, nothing prohibits it from imposing that penalty for violating *any* provision of the Criminal Code, a result that would be plainly irrational.

*Lindner,* 129 Ill.Dec. at 68–69, 535 N.E.2d at 833–34 (emphasis in original).

It is from those concepts advanced by *Lindner* that we find equal relevance and appropriateness to the application of driving privilege suspension for offenses such as unpaid child support and delinquency for payment of state taxes and fees. If we are going to use driver's license suspension as a punishment for disassociated offenses, then the right to drive in our society becomes contingent upon conduct which has nothing to do with the creation of a hazard on the highways or the requirement of the individual to have access to a vehicle in order to be a productive citizen and maintain gainful employment. The test clearly evidenced from the court's decision was the recognition that safety had no relationship to the additional penalty created by the infliction of a driver's license suspension. That court also quite properly discerned that a potential driver's license suspension would hardly serve as a sex offense deterrent; as here, it would unlikely stop fraternity or sorority private parties or high school get-togethers in private homes.

It is recognized that countervailing current authority can be found approving in some context minor in possession/use conviction revocations of driving privileges. The case cited in briefing, although neither the strongest nor the closest in statutory application, is the intermediate appellate case in Pennsylvania of *Com. v. Strunk,* 400 Pa.Super. 25, 582 A.2d 1326 (1990). The majority was not burdened in opinion review with constitutional limitations on special legislation and found no requirement that the punishment inflicted for a criminal offense related to the offense of conviction. The court would not find "that this penalty violates the proscription against cruel and unusual punishment by imposing a penalty that is *grossly* disproportionate to the underlying offense." *Id.* 582 A.2d at 1332–33 (emphasis in original). In assuming some unproved relationship between drinking under age and highway fatalities, this assumed relationship gave a reasonable cogency to the legislative enactment justifying affirmation. The double jeopardy issue was avoided since the court suspended the license as a punishment within the sentence entered and no inde-

pendent administrative agency action was required.

We would agree that the dissent won the argument in protective constitutional concepts and logic in the concept that the decision was "unpersuasive, as both incomplete on the law and dangerous as a matter of precedent." *Strunk*, 582 A.2d at 1333, Popovich, J., dissenting. The dissent would require a " 'rational relationship' or nexus between the end and the means so as not to make selection of the particular means entirely arbitrary as a matter of penology." *Id.* We agree with that comment and also with the further thought expressed:

> There exists within our penal system a rationality such that a fine or penalty should reflect the gravity or moral reproachability of a particular crime. One might wonder, and rightly so, why the legislature singled out underage drinking as deserving of a truly "special" penalty, whereas other offenses committed by juveniles such as vandalism, shoplifting, disorderly conduct, loitering, etc., receive a much different penalty. Indeed, if the focus is on the intractable nature of juvenile deterrence, then removal of one's license might serve the much-needed deterrent function with respect to each of these crimes, yet there appears no rational reason to afford one crime, but not the other, separate treatment. Perhaps most troublesome is that when selection of a penalty is arbitrary, the public, as well as the individual offender, is more prone to perceive the penal system as arbitrary in punishing for offenses not committed. Moreover, the offense of driving while intoxicated already commands a significant penalty which presumably serves a considerable deterrent function. Thus, without an indication that the crime of underage drinking was accompanied by the operation of a motor vehicle, the mere fact that drinking is associated with driving in the abstract will not suffice to supply the requisite rationality.

> \* \* \* \* \* \*

Instantly, while the majority found a "deterrent" interest supported by the

penalty of license suspension, I am hardpressed to fathom a penalty which, assuming the appropriate severity, does not serve a similar function. With this as the standard, I see no standard at all. Moreover, our task, contrary to the majority's interpretation, is not to ignore the express relationship offered by the legislature and immediately hypothesize as to possible rational relationships. A plain interpretation of the statute confirms a relationship as between the offense of underage possession of brewed beverages and the penalty of, *inter alia*, suspension of operator's privileges.

*Id.* at 1334 (footnote omitted). It was further stated:

> Our task must be to ascertain whether the relationship was reached in an arbitrary manner. To be sure, ignoring the rationality of the relationship might be to further to some degree a serious problem with juvenile crime. But without a coherent limiting principle, the doctrine \* \* \* has much graver implications beyond the facts at bar. I fear \* \* \* judicial tolerance of arbitrary forms of penology and thereby pav[ing] the way for analogous laws.

> > 3—The test of "rational relationship" as defined by the "deterrence" rationale is not logically cabined solely to the offense of underage drinking or offenses committed by minors. Consider a legislature desirous of deterring juvenile vandalism. Under today's rationale, and owing to the intractable nature of juvenile deterrence, the legislature might rationally consider suspension of operator's privileges as an effective deterrent. Following like reasoning, the legislature might penalize public drunkenness or disorderly conduct or loitering with suspension of operator's privileges. To be sure, these are but a few examples. Troublesome with the "deterrence" rationale is that its limits are largely defined by the ingenuity of legislators, not by the test of rationale relationship

under the substantive component to the Due Process Clause.

*Id.* at 1334–35 (footnote included).

The basic authority used to validate driver's license suspension punishment for disassociated offenses developed in juvenile controlled substance conviction cases. *Matter of Maricopa County, Juvenile Action No. JV-114428*, 160 Ariz. 90, 770 P.2d 394 (1989); *State v. Smith*, 58 N.J. 202, 276 A.2d 369 (1971). Although we do not elect to generally follow the equal protection/special legislation/due process/double jeopardy concepts of those cases, there is a clear difference in use or possession of a controlled substance offense, which involves a substance that is illegal at any age, as comparable to the use of alcohol which is proscribed in these appeals only by age and circumstance and is in our society otherwise legal and customary.[12]

**12.** A casual acceptance in the cases that a right to drive in this American society is not "fundamental" lacks both economic and logical application to this present real world. The automobile is of the essence of this country's functional conduct as a society and is also totally intrinsic to the behavior and aspiration of most Americans, not to mention its foundational place within the national economy. Food might be sacrificed, but never the automobile. Unfortunately, as found from the number of unlicensed drivers involved in accidents, it is easier to suspend driver's licenses than it is to keep unlicensed persons from driving. With little public transportation in Wyoming, the motor vehicle and its usage is even more closely woven into citizens' conduct and society's operation.

The right to drive and use an automobile inevitably involves the right to travel. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). *See also Zobel v. Williams*, 457 U.S. 55, 65, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (Brennan, J., concurring and cases therein cited). The component of driving in potentiality for harm is clearly inculcated with the public interest resulting from dangerousness. Foreseeable liability with reoccurrence of death and damage justifies the police power exercised responsibility for legislation. We will not either demean the exercise of the police power for legislation or the incident of driving as both involve fundamental constituents of life in this modern world. Automobiles and driving, while indispensable generally in this society, also achieve a basic constitutional status for standards of preemptive regulation *as a simple fact of life.*

A freedom to travel constituent of present society is posited in accord with *Zobel*, 457 U.S. at 65, 102 S.Ct. at 2315 (Brennan, J., concurring). Variant reasons could be found to deny the right to drive to anyone under any arbitrary age, twenty-one or twenty-five, or over a similarly arbitrary age, sixty-five or seventy, but not just to those only under nineteen who visit a house party in a circumstance proscribed by a city ordinance. We recognize a state constitutional right to travel intrinsically protected by Article 1 of our constitution and emplaced in Wyo. Const. art. 1, § 2, equality; art. 1, § 7, no absolute, arbitrary power; and art. 1, § 36, rights not enumerated reserved to the people.

Within these general sections, freedom of travel must be included.

By parity of reasoning, comparison can be made to the decisions of various courts addressing the concept that automobile use was not fundamental within our society when the guest statute litigation through *Silver v. Silver*, 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221 (1929), and then the seminal case *Brown v. Merlo*, 8 Cal.3d 855, 106 Cal.Rptr. 388, 506 P.2d 212 (1973), continued to this court's decision in *Nehring*, 582 P.2d 67. *See* Annotation, *Constitutionality of Automobile and Aviation Guest Statutes*, 66 A.L.R.3d 532 (1975). *See also* Comment, *The Constitutionality of Automobile Guest Statutes: A Roadmap to the Recent Equal Protection Challenges*, 1975 B.Y.U.L.Rev. 99 (1975); Andrew Kull, Comment, *The Common Law Basis of Automobile Guest Statutes*, 43 U.Chi.L.Rev. 798 (1976); and the constitutional revocation of the Wyoming statute by this court, *Nehring*, 582 P.2d 67.

Although the case investigated public service commission regulation of common carriers, the quotation by Chief Justice Blume of an earlier West Virginia case remains informative:

"The right of a citizen to travel upon the highway and transport his property thereon, *in the ordinary course of life and business,* differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stagecoach or omnibus. The former is the usual and ordinary right of a citizen, a right common to all, while the latter is special, unusual and extraordinary. * * *"

*Weaver v. Public Service Commission of Wyoming*, 40 Wyo. 462, 476, 278 P. 542, 546 (1929) (quoting *Ex parte Dickey*, 76 W.Va. 576, 579, 85 S.E. 781, 782 (1915)).

The fact that the exercise of the right of citizens to drive causes danger to other drivers where harm may occur so that regulation is appropriate does not make it any less a fundamental right within the practical facts involved in the inappropriate exercise with consequent risk of danger and possible harm. *Cf. Campbell v. State, Dept. of Revenue, Div. of Motor Vehicles*, 176 Colo. 202, 491 P.2d 1385 (1971). *See, however, Heninger v. Charnes*, 200 Colo. 194, 613 P.2d 884 (1980). Likewise, there was no rational classification inquiry focused in deci-

The difference between controlled substances and alcohol usage is found in the subclassification where here, the use of alcohol is improper equivalently to age twenty-one, but only those persons under the age of nineteen are subject to the additional punitive sanction. In the drug cases, a subclassification of the suspect class by age alone is not created. The ambivalence of the difference between ages nineteen and twenty where usage is equally illegal to age twenty-one was not created by the controlled substance enactments. It is also too obvious to require extended reference to recognize that even by including an additional punishment, commencing with the date of the New Jersey enactment, *circa* 1970, the use of controlled substances by both adults and the under age, did not disappear. Another significant difference also exists since, by both the Arizona and New Jersey statutes, suspension remained a judicial function entered conjunctively with other punishment as one sentence and not subsequently inflicted as additional retribution by action of an administrative agency.[13]

We also decline to follow the direction demonstrated in analysis of the Oregon statutes, *State v. Day*, 84 Or.App. 291, 733 P.2d 937 (1987); *State ex rel. Juvenile Dept. of Columbia County v. White*, 83 Or.App. 225, 730 P.2d 1279 (1986), which confined its decision to a suspect analysis of a proscribed class age thirteen through seventeen—which turned out to be eighteen by the *White* decision. The Oregon case discussion was confined to the subject classification and disproportion of penalty which concepts in *pari materia* we do not follow in resolution here.

The Arkansas law which is differently phrased, *see Carney v. State*, 305 Ark. 431, 808 S.W.2d 755 (1991), would not reach application here because it is clearly confined to state statutory violation of the alcohol or controlled substance offense and, conversely, provides for a hardship exception. That law triggers application as part of the sentence through order of the court to the license bureau until the minor reaches eighteen years of age or twelve months, whichever period is longer. The Arkansas review embraced only the age classification and did not consider as cited authority the disproportion of the punishment for a disassociated offense.[14] Similar

sion for suspension after a second DWUI conviction in *Moreno v. State, Dept. of Revenue and Taxation*, 775 P.2d 497 (Wyo.1989).

**13.** The operational difficulty with the initial New Jersey law as equally encountered by the Wyoming statute, each of which required changes in the next session while an appeal was in progress, is illuminating. The New Jersey opinion of *Smith*, 276 A.2d 369 was actually written when the law which is discussed no longer existed. By that time, amendments included the change to provide for a discretionary decision by the sentencing court and elimination of any first offender application. Renovated statutes and bad cases which result in immediate legislative change do not necessarily yield the most logical precedent.

**14.** Although clearly based solely on statutory construction, a decision of the California Supreme Court, *Mercer v. Department of Motor Vehicles*, 53 Cal.3d 753, 280 Cal.Rptr. 745, 809 P.2d 404 (1991), provided informative thought in recognizing that the state could suspend or revoke a driver's license for failure to submit to chemical testing only with evidence of an observed moving violation of a vehicle. Driving was required to trigger application of the mandatory provisions of the implied consent statute.

An even more recent topic of relevance is found in another California case, *Ellis v. Pierce*, 230 Cal.App.3d 1557, 282 Cal.Rptr. 93 (1991), involving refusal to take the chemical test in conjunction with the *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) double jeopardy question. The California court found that the driver's license suspension was not remedial for the purpose of the *Halper* decision, was likewise not compensatory and furthermore could not "be fairly characterized as a deterrent or retribution, either." *Ellis*, 282 Cal.Rptr. at 95.

The court recognized that the generic purpose was to " 'provide safety for all persons using the highways * * * by quickly suspending the driving privilege of those persons who have shown themselves to be safety hazards by driving with an excessive concentration of alcohol in their bodies[,]' " *id.* at 95 (quoting a California statute), which was neither deterrent nor retributive, but rather to provide a protection to public safety by keeping drunk drivers off the public roads in facilitation of the gathering of evidence. A similarity was found by comparison to the disbarment or suspension of an attorney after conviction of a crime involving moral turpitude. The court concluded:

The attorney's disbarment or suspension does not constitute a second punishment in viola-

statutes are found for Utah and Colorado. Utah Code Ann. § 78–3a–39.5 (1992); Colo. Rev.Stat. § 42–2–122(5)(a) (Supp.1991).

### C. Excessive Fine and Cruel and Unusual Punishment Preclusion

**Bail; cruel and unusual punishment.**

All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, *nor shall cruel or unusual punishment be inflicted.*

Wyo. Const. art. 1, § 14 (emphasis added).

**Penal code to be humane.**

The penal code shall be framed on the humane principles of reformation and prevention.

Wyo. Const. art. 1, § 15.

▮ We are also persuaded that the double character of punishment inflicted sequentially upon this limited category of persons under age nineteen fails in initial compliance with the first restriction addressed in Wyo. Const. art. 1 and also impermissible under the *Solem* Eighth Amendment limitation on proportionality.[15] *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

Overtly for those philosophers of the law who have decided that the motto is "do unto others, but do not do it to yourself," there is a far easier way to bring prohibition back to this segment of our society which would be to enforce the restriction on everyone, including adults. This could be done with the penalty more appropriately severe for the adult, not less, whose conduct creates the society within which alcohol and controlled substances are available to and abused by both the adult and the minor. Nations with the governmental structure of totalitarianism and religious direction to define appropriateness of individual conduct, such as Saudi Arabia, demonstrate that prohibition can be enforced if it is universally applied with a sufficiently severe punishment—loss of arm or leg or perhaps one's head.

Addressing duplicative sequential proportionality, we have punishment for the minor when first enforced by judicial action and a sequential second punishment enacted by the legislature and enforced by the executive branch to be completely supplementary and totally different than the responsibility if the individual involved is nineteen or older.

Appellants thoughtfully address this constitutional violation:

> This harsh and disproportionate punishment, even when considered with the deference due the legislature, cannot withstand constitutional scrutiny. The court in *Oakley v. State,* 715 P.2d 1374 (Wyo.1986), stated the Eighth Amendment proportionality analysis applied by the Supreme Court in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) as follows:
>
> > In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria,

tion of the Double Jeopardy Clause because the State Bar proceeding is *"sui generis,* neither civil nor criminal in character." (*Fitzsimmons v. State Bar,* 34 Cal.3d 327, 332, 193 Cal.Rptr. 896, 667 P.2d 700 (1983), emphasis in original, quoting *Yokozeki v. State Bar,* 11 Cal.3d 436, 447, 113 Cal.Rptr. 602, 521 P.2d 858 (1974).) This is because the purpose of the disbarment or suspension is not to punish, but to protect the public from unfit lawyers. That purpose is "reminiscent of" but nevertheless distinct from the criminal process. *Ellis,* 282 Cal.Rptr. at 95.

The applied concept that suspension processes should relate to conduct of the driver and safety of the public and not as a disassociated punishment for another character of misconduct is clearly applicable to this case.

15. We are aware of the severe pressure that may have been applied to proportionality by recent decisions of the United States Supreme Court. *See, e.g., Harmelin v. Michigan,* — U.S. —, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). However, it is clear that a proportionality character of punishment remains as a constitutional imperative without regard for the variant postures adopted by the members of the United States Supreme Court in *Harmelin.* In this case, the gravity and severity of the punishment as a second course of societal imposition for the "minor miscreant" evidences no reasoned relationship to the attained difference immediately after a person becomes nineteen. (For current reconsideration of *Harmelin* to state law, see *State v. Bartlett,* 171 Ariz. 302, 830 P.2d 823 (1992)).

including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Oakley,* 715 P.2d at 1376–77 (*quoting Solem,* 463 U.S. at 292, 103 S.Ct. at 3010).

The harshness of the penalty far exceeds the gravity of the offense in this case; evidence of that is found in the comparison of the penalty visited upon those under nineteen and the far lighter penalty which nineteen and twenty year olds receive for the same offense. A punishment for violation of the Sheridan City Ordinance that is considered commensurate to the offense for nineteen and twenty year olds, is but a preamble if the offender is under nineteen. Yet if the penalty for nineteen and twenty year olds is appropriate to the gravity of the offense, then the penalty for those under nineteen is far out of proportion.

The difficult issues implicit in disproportionate sentencing faced by this court in the *Wright* cases demonstrate a recognition constitutionally that sentencing should make sense explicitly within societal responsibility and for retributory infliction to

meet the criteria of due process, equal protection and the reformation and prevention criteria of Wyo. Const. art. 1, §§ 14 and 15. *Wright v. State,* 707 P.2d 153 (Wyo.1985); *Wright v. State,* 670 P.2d 1090 (Wyo.1983). *See also State v. Bartlett,* 830 P.2d 823 (Ariz.1992).

**D. Double Jeopardy**

**Self-incrimination; jeopardy.**

No person shall be compelled to testify against himself in any criminal case, *nor shall any person be twice put in jeopardy for the same offense.*

Wyo. Const. art. 1, § 11 (emphasis added).

 Other states provide a somewhat comparable result as that achieved in these Wyoming cases—however, they do so within a significantly different statutory framework. For the most part, these other states [16] include the threat of driver's license suspension as a discretionary and *judicially-imposed* penalty for a minor in possession offense.

In contrast under the present Wyoming structure, judicial involvement ends with sentencing after a city ordinance or state misdemeanor violation under the alcohol control code. Driver's license suspension is then imposed by administrative action pursuant to Wyo.Stat. § 31-7-128(f) as an add-

---

**16.** The Pennsylvania statutory process, 18 Pa. Cons.Stat.Ann. § 6310.4 (Purdon Supp.1991), recognizes a judicial function in assessment of the penalty and provides a series of sequential suspensions to be *entered as a penalty for the offense by judicial action.* It is interesting to note that the initial Pennsylvania act included an insurance premium provision similar to what is now provided in current Wyoming law.

An insurer shall not increase premiums, impose any surcharge or rate penalty, or make any driver record point assignment for automobile insurance, nor shall an insurer cancel or refuse to renew an automobile insurance policy on account of a suspension under this section.

*Id. See Strunk,* 582 A.2d 1326.

The Utah statute, Utah Code Ann. § 78–3a–39.5 (1992) (juvenile code provision), similarly provides for judicial action as the sentence for the possession violation and provides an age limitation of younger than eighteen years. The law additionally provides a permissive right for judicial discretion whether to suspend (on the first offense).

Colo.Rev.Stat. § 42–2–122(5)(a) (Supp.1991) applies the law to persons under seventeen

years of age and provides an alternative in the judicial sentencing of first conviction—either twenty-four hours of public service or three months suspension.

Ark.Code Ann. §§ 5–64–710, 5–65–116 and 27–16–914 (Michie Supp.1991) provide a license suspension for persons under the age of eighteen and relate to court action as an order of denial of privileges including a hardship exception. In *Carney,* 808 S.W.2d 755, deterrence was the principle applied by the court in authenticating the relevant statute.

Oregon state law is age seventeen (under age eighteen, *see White,* 730 P.2d 1279) or under adaptation for any crime, violation, infraction or other offense involving the possession, use or abuse of alcohol within the enforcement process of a violation order issued by the court of conviction. 1985 Or.Laws ch. 16, § 206. *See Day,* 733 P.2d 937 and *White,* 730 P.2d 1279.

In all states with any reasonably comparable statutes which were found in research, the revocation involves judicial action and results in authentication as part of the sentencing order.

ed punishment for the previous conviction. That approach directly raises the double jeopardy punishment confinement of U.S. Const. amend. V and Wyo.Const. art. 1, § 11. This concept comes here generally not briefed by the litigants and apparently not considered by the legislature in enactment.

The question is not novel since directly addressed by the United States Supreme Court in *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). In *Halper*, Justice Blackmun addressed the issue "under what circumstances a civil penalty may constitute 'punishment' for the purposes of double jeopardy analysis." *Id.* at 436, 109 S.Ct. at 1895. In analysis of the three distinct abuses addressed by the Double Jeopardy Clause, the third—multiple punishments for the same offense—was at issue in *Halper*. Justice Blackmun recognized "[t]he third of these protections—the one at issue here—has deep roots in our history and jurisprudence." *Id.* at 440, 109 S.Ct. at 1897. He recognized this to be a settled issue in American constitutional law. In *Halper*, the defendant had been judicially convicted, punished by a jail term and fined $5,000.00. The further question was whether a False Claims Act civil liability of $130,000.00 could be added. The inquiry was addressed:

> We turn, finally, to the unresolved question implicit in our cases: whether and under what circumstances a civil penalty may constitute punishment for the purpose of the Double Jeopardy Clause.

*Id.* at 446, 109 S.Ct. at 1900. The court determined that the assessment of labels "criminal" or "civil" was not of paramount importance. *Id.* at 447, 109 S.Ct. at 1901. Rather, the inquiry addressed whether the civil proceedings had punitive as well as remedial goals.

> We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.* at 448–49, 109 S.Ct. at 1901–02. Clearly, the basis of the minor in possession/use license suspension was driven by deterrent and retribution concepts in legislative enactment. It was certainly not intended to be remedial in repaying an injured victim.

■ In Wyoming, proceedings to suspend or revoke a driver's license are civil and not criminal in nature. *Moreno v. State, Dept. of Revenue and Taxation*, 775 P.2d 497 (Wyo.1989); *State, Dept. of Revenue and Taxation v. Hull*, 751 P.2d 351, 356 (Wyo.1988). Here, those civil proceedings are sequentially applied to provide an additional punishment. That result is rejected by *Halper*. Furthermore, for this purpose, the legislature did not establish the criminal offense; it only created the crime by enunciating the punishment. *State v. A.H. Read Co.*, 33 Wyo. 387, 240 P. 208 (1925). In the immediate cases presented, the city council creates the crime and the administrative agency, as a state punishment, applies the subsequent deterrent which would be beyond the authority of the municipality to separately inflict. Nowhere in state statutes are the charged activities of these specific appellants declared to be in violation of a legislatively enacted criminal offense. This punishment is only applied after the individual has been sentenced for violation of a city ordinance. Consequently, this statutory system magnifies the assessed punishment otherwise available to the city court by introduction of the state administrative agency for further sanction. *State ex rel. Motor Vehicle Div. v. Holtz*, 674 P.2d 732 (Wyo.1983). " 'A constitution is not to be made to mean one thing at one time and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule seem desirable.' " *Rasmussen v. Baker*, 7 Wyo. 117, 131–32, 50 P. 819, 822 (1897) (quoting Cooley's Const. Lim., 54).

Current indexing resources reveal only one *Halper* case which provides analysis of some relevance to these cases. In *Ellis v. Pierce*, 230 Cal.App.3d 1557, 282 Cal.Rptr. 93 (1991), *Halper* was raised where the driver was convicted of driving under the

influence and then subjected to the effects of a refusal to take a blood-alcohol test. The California court found that the duality of suspension result was not deterrent or retribution, but rather considered to be *sui generis* in the character of disbarment of an attorney after conviction for a crime involving moral turpitude by providing a protection to the public in keeping an unfit lawyer from practicing law. The relevance of this case is the connection of refusal to take the test to proof and circumstances involved in an offense involving driving under the influence. However, since no driving offense is involved in these present appeals, a comparability factor cannot be found. An analogous double jeopardy analysis is found where first, a civil fine is assessed and is then followed by criminal contempt. Since both proceedings were punitive, the separate assessment of punishment violated double jeopardy. *Small v. Com.*, 12 Va.App. 314, 398 S.E.2d 98 (1990).

Within the Wyoming statutory system, there is no judicial sentencing action or discretion involved in these minor/alcohol conviction cases which applies as part of the punishment—license suspension. The second sequence punitive result of the minor in possession/use or direct conviction is a post-sentencing administrative agency action to provide successive punishment. We find this result where the punishment is not determined and entered by the court to invade the prohibition of double jeopardy under Wyo. Const. art. 1, § 11 and also, although this decision is made under state law, the Fifth Amendment to the United States Constitution under *Halper*, 490 U.S. 435, 109 S.Ct. 1892. See likewise the extension of punishment to a disassociated deterrent where a loss of citizenship was involved as a case that is not totally unlike the lesser city punishment and the significant state-inflicted deterrent involved here, *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).[17]

## IV. CONCLUSION

Few enactments passed in current time by the Wyoming legislature directly affect more persons than driver's license suspension as a tie-in punishment for violation of

**17.** The recognition of the author, Chief Justice Earl Warren, in *Trop* remains cogent here.

Courts must not consider the wisdom of statutes but neither can they sanction as being merely unwise that which the Constitution forbids.

We are oath-bound to defend the Constitution. This obligation requires that congressional enactments be judged by the standards of the Constitution. The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights. When the Government acts to take away the fundamental right of citizenship, the safeguards of the Constitution should be examined with special diligence.

The provisions of the Constitution are not time-worn adages or hollow shibboleths. They are vital, living principles that authorize and limit governmental powers in our Nation. They are the rules of government.

*Trop*, 356 U.S. at 103, 78 S.Ct. at 599. We should not extend the typical driver's license suspension analysis to these cases since no driving or vehicular use offense is involved. Cases which address the right to drive could be applied to anyone of any age equally. *See Mackey v. Montrym*, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) and *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.E.2d 172 (1977) to be compared with *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (regulation of driving activities). Comparable are other activities such as those encompassing control or regulation which are found to address a more appropriately identified policy power exercise in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (sale of drug paraphernalia); or that require the Jaycees organization to admit women to membership, *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

Conversely, drinking alcohol at a private party which is not illegal under state law presents greater similarity to the preclusive ordinance which requires persons who "loiter or wander" to provide " 'credible and reliable' " identification upon police officer demand. *Kolender v. Lawson*, 461 U.S. 352, 353, 103 S.Ct. 1855, 1856, 75 L.Ed.2d 903 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Although this last case was determined on a basis of vagueness, we find a similarity in outreach of police power control and disassociated enforcement opportunity. *Kolender*, 461 U.S. 352, 103 S.Ct. 1855. See similarly within a discussion of a town vagrancy ordinance, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); and assessed costs on criminal charge acquittal, *Giaccio v. State of Pa.*, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966).

a city ordinance or state law preclusion against the use or possession of alcoholic beverages by a person under the age of nineteen. In determining that the centrality and penumbra of protections provided by the Wyoming Constitution, precluding both enactment of special legislation and creation of double jeopardy while guaranteeing equal protection and fair and appropriate sentences for punishment and prevention of criminal offenses, extend to a motor vehicle driver's license suspension, we declare Wyo.Stat. § 31–7–128(f) and the associated statutory provisions of Wyo. Stat. § 31–7–126 in violation of the Wyoming Constitution.

The certified questions advanced by McCarty and King, Docket No. 91–15, are consequently answered:

a. Do W.S. 31–7–126 and W.S. 31–7–128(f) deprive Plaintiffs of equal protection or due process in violation of the Wyoming Constitution?

ANSWER: YES.

b. Do W.S. 31–7–126 and W.S. 31–7–128(f) deprive Plaintiffs of equal protection or due process in violation of the United States Constitution?

ANSWER: NOT ANSWERED.

c. Do W.S. 31–7–126 and W.S. 31–7–128(f) inflict cruel and unusual punishment upon Plaintiffs in violation of the Wyoming Constitution?

ANSWER: YES.

The license suspension decisions of the Chief Hearing Examiner from which appeal is taken regarding Johnson, Radosevich, Archibald and Hampton, Docket No. 90–297, are reversed.

The cases are remanded to the administrative agency for further proceeding in compliance herewith. Certified questions a and c of Docket No. 91–15 are answered in the affirmative and the license suspension decisions in Docket No. 90–297 are reversed and remanded.

THOMAS, Justice, concurring specially.

I agree that the challenged statutory scheme must be abrogated as unconstitutional under the requirements of our equal protection of the law provision in the State constitution. Art. 1, § 34, Wyo. Const. I join in the opinion of the court insofar as it so holds.

Beyond that holding, the opinion of the court is too far ranging in philosophy, jurisprudence, and legal theories. I cannot subscribe to all of concepts and dicta incorporated therein, and consequently I join only in the result reached of declaring the statutes unconstitutional.

CARDINE, Justice, specially concurring.

I concur in the result and in that part of the court's opinion holding that W.S. 31–7–126 (Cum.Supp.1990) and 31–7–128(f) (Cum. Supp.1990) violate the equal protection and due process clauses found in the Fourteenth Amendment to the United States Constitution and Art. 1, §§ 2 and 6 of the Wyoming Constitution.

I do not agree that *Hoem v. State*, 756 P.2d 780 (Wyo.1988), is "completely consistent" with Justice Stevens' analysis in *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 451, 105 S.Ct. 3249, 3260, 87 L.Ed.2d 313 (1985) (Stevens, J., concurring), or that it is authority for the decision in this case. If it were so, I would have affirmed. *Hoem* involved no statutory criminal activity, no license revocation, no enhanced penalty for violation of a criminal law, and a reasonable classification not based on age alone. *Hoem* was a case in which legislation was enacted to deal with a perceived serious problem in the medical negligence area. The statutes adopted had a valid purpose; the means adopted for accomplishing that purpose was reasonable; and there was substantial connection between the purpose and the provisions of the statutes creating the medical review panel. No rights were lost, no real penalty imposed. Similar statutes had been held constitutional by other states (more than 22). Three states had held dissimilar statutes unconstitutional. *See Hoem*, 756 P.2d at 787 (Cardine, J., dissenting).

The Medical Review Panel Act was not unlike the procedure established for bringing a sexual harassment suit under Title VII of the Civil Rights Act of 1964. Before

suit is filed, a charge must be filed with the Equal Employment Opportunity Commission which has six months to investigate, conciliate and attempt to resolve the conflict. The Act simply did not create a constitutionally objectionable scheme such as the one we address here.

Now, to the case at hand. The driver's licenses of appellants (minors under the age of 19 years) were revoked because they possessed alcoholic beverages. It is a violation of W.S. 12–6–101 for a minor under the age of 19 years to possess alcoholic beverages (subject to an employment or working exception). It is a violation of W.S. 12–6–101 for a minor under the age of 21 years to possess alcoholic beverages (subject to an employment or working exception). It is lawful for a person over the age of 21 years to possess an alcoholic beverage.

> (a) A person under the age of 19 years who possesses an alcoholic beverage may be fined $750, sentenced to six months in county jail, *and his driver's license is revoked.*
> (b) A person over the age of 19 years and under 21 years who possesses an alcoholic beverage may be fined $750 and sentenced to six months in county jail.
> (c) A person over the age of 21 years who possesses an alcoholic beverage is subject to no fine or penalty at all.

All persons who engage in this same activity are divided into three classifications. The classes are separated by age only. The age difference between the most penalized and the least penalized class is two years and one day. Yet we were informed at argument that the revocation of the driver's licenses of persons under 19 years of age was for highway safety. The greatest incidence of alcohol related driving accidents is in the 23–year–old age group, which is the least penalized class. The classification, therefore, is arbitrary. The statutes providing for revocation of driver's licenses of persons under 19 years of age for possession of alcoholic beverages are unconstitutional because they are not a reasonable means to accomplish a valid public purpose; they do not operate equal-

ly, uniformly, and fairly; and they are arbitrary in classification and penalty.

BROWN, Justice (Retired), dissenting.

The majority opinion is carefully and skillfully crafted. If the opinion were developed in a vacuum as an academic exercise, I could join same.

Declaring Wyo.Stat. § 31–7–126 (Supp. 1990) and Wyo.Stat. § 31–7–128(f) (Supp. 1990) unconstitutional will result in more people under the age of twenty-one who have a love affair with alcohol driving on the roads and highways. Increased drunken driving will result in more fatalities and injuries. Declaring Wyo.Stat. § 31–7–126 and Wyo.Stat. § 31–7–128(f) unconstitutional will be a boon to those on a waiting list for an organ transplant; however, for appellants, relatives and friends, it is a pyrrhic victory.

In an article, Rosenthal, *The Minimum Drinking Age for Young People,* 92 Dick. L.Rev. 649, 654–60 (1987–88) (footnotes omitted), sobering statistics are set out:

> [T]he great majority of the soundly-designed studies found that raising the drinking age decreased fatal accidents.
> * * *

> * * * * * *

The number of accidents involving drunken driving is quite high. These accidents account for more than one-half of the 45,000 deaths in the United States caused by traffic accidents each year. The effect of mixing driving and alcohol is even stronger on the young. Alcohol-related traffic deaths are the number one killer of fifteen to twenty-four-year olds, and they account for approximately fifty percent of all teenage deaths. In addition, sixteen- to twenty-four-year old drivers represent twenty percent of licensed drivers in the United States and less than twenty percent of total miles driven, yet they account for forty-two percent of all fatal alcohol-related accidents. Further, because of drunken driving, the life expectancy of teenagers has remained constant for the last twenty years even though the life expectancy of every other age group has improved during this period. Young drivers who

drink are highly dangerous to themselves, as well as to everyone else.

One interesting study measured the fatal auto accidents involving alcohol for each 100,000,000 vehicle miles travelled. Teenage drivers had the highest alcohol-involved fatal accident rate of any age group—a rate of approximately 4.5 per 100,000,000 vehicle miles compared to 3.38 for twenty-year olds, 4.08 for twenty-one-year olds, 3.10 for twenty-two to twenty-four-year-olds and 1.50 for twenty-five to forty-four-year olds. The rates for persons in their early twenties, while less than those for teenagers, are still quite substantial and strongly implicate the involvement of drivers in this group in fatal accidents involving alcohol. The study showed that eighteen-, nineteen-, and twenty-year olds had alcohol-involvement fatal-accident rates very close to the rates of the sixteen- and seventeen-year olds. * * *

 * * * * * *

* * * Raising the minimum drinking age had a positive effect in ten of the thirteen states. The investigators estimated that fatal crashes involving alcohol-impaired drivers were reduced by thirteen percent. They also estimated that raising the minimum drinking age to twenty-one nationally would save approximately 550 lives each year.

A study conducted by the Insurance Institute for Highway Safety measured the effects of raising the minimum drinking age in the twenty-six states that had done so between 1975 and 1984. The researchers estimated that, as a result of the increasing drinking age, "nighttime driver fatal crash involvements" decreased by thirteen percent.

Another study examined nine states that raised the minimum drinking age between September 1, 1976, and January 1, 1980. It estimated that "each year there could be about 730 fewer young drivers involved in nighttime fatal crashes if in all states the drinking age for all alcoholic beverages was raised to twenty-one. It also estimated that any state which raises its minimum drinking

age "can expect the nighttime fatal crashes of drivers of the affected age groups to drop by about twenty-eight percent.

 * * * * * *

* * * When the concern is something as important as death or injury by drunken-driving, society should not afford autonomy to eighteen- to twenty-year olds, but should rather be more paternalistic. The alcohol-crash-record of persons in this age group is relatively high compared to other age groups. Its members have not shown that they can be treated like adults in alcohol-related decisions and they have not shown themselves to be responsible.

Professor Rosenthal's footnotes reference studies to support each statistic quoted and his article shows that the effect of raising the drinking age takes more drunken drivers off the highways. Wyo.Stat. § 31–7–126 and Wyo.Stat. § 31–7–128(f) were designed to keep certain young drivers who keep company with John Barleycorn off the highway and, thus, reduce fatalities and injuries. The fallout of the majority opinion will be to put more young drunks on the highway.

In determining whether the challenged statutes are constitutional, certain general principles must be given effect. Statutes are presumed to be constitutional. *Baskin v. State ex rel. Worker's Compensation Division,* 722 P.2d 151, 156 (Wyo.1986). The burden is on whoever attacks constitutionality to show beyond a reasonable doubt that a statute is unconstitutional. *O'Brien v. State,* 711 P.2d 1144, 1147 (Wyo.1986). When courts can uphold the validity of a statute and further the legislative intent in enacting the measure, they are bound to do so. *In re Application for Certificate of Need by HCA Health Services of Wyoming, Inc.,* 689 P.2d 108, 114 (Wyo.1984). Any reasonable doubts are to be resolved by upholding the statute if possible. *Armijo v. State,* 678 P.2d 864, 867 (Wyo.1984).

When a statute is challenged on equal protection grounds, as in this case, the burden is upon the party alleging denial of

equal protection to show that it has been subjected to disparate treatment resulting in denial of equal protection. *United States Steel Corporation v. Wyoming Environmental Quality Council*, 575 P.2d 749, 754 (Wyo.1978). "Equal protection does not require exact equality. Only discrimination which is arbitrary and invidious is prohibited." *Bell v. State*, 693 P.2d 769, 771 (Wyo.1985).

Appellants here have raised claims under both the United States and Wyoming Constitutions. This court has held these respective equal protection provisions are equivalents. *Washakie County School Dist. No. One v. Herschler*, 606 P.2d 310, 332 (Wyo.1980); *O'Brien*, 711 P.2d at 1147.

Equal protection issues are determined by applying one of two levels of judicial scrutiny. If an ordinary interest is involved, the court will determine if there is a rational relationship between the classification and a legitimate state objective. If a fundamental interest is affected, the classification will be subjected to a close scrutiny to determine if it is necessary to achieve a compelling state interest. If the legislature had some arguable basis for choosing the end and the means chosen, then the courts will sustain the law. *O'Brien*, 711 P.2d at 1147. The inquiry here asks what type of interest is affected by the legislation. It is conceded by appellants that no fundamental right is affected. Therefore, the statutes:

> need only bear a reasonable relation to the legislature's legitimate interest in preserving the economic and social stability of the state. Such a standard is highly deferential to the constitutionality of the statute. That is, if any conceivable basis exists which will reasonably, although arguably, support the enactment, we will assume that the legislature acted in a non-arbitrary and rational manner, and will hold the statute to be constitutional. *Hoem v. State*, 756 P.2d 780, 782–83 (Wyo.1988); *Cheyenne Airport Board v. Rogers*, 707 P.2d [717,] at 727 [ (Wyo.1985) ]; *Mountain Fuel Supply Co. v. Emerson*, 578 P.2d 1351, 1355 (Wyo.1978).

*White v. State*, 784 P.2d 1313, 1316 (Wyo. 1989). Simply stated: Is the classification chosen by the legislature rationally related to achieving a legitimate governmental interest?

The equal protection provision of the constitutions, "guarantees that similar individuals will be dealt with in a similar manner by the government." Nowak, Rotunda, Young, *Constitutional Law*, 2nd Ed. Ch. 16, § 1 at 586 (West 1983).

> If the government classification relates to a proper governmental purpose, then the classification * * * does not violate the guarantee when it distinguishes persons as "dissimilar" upon some permissible basis in order to advance the legitimate interests of society.

*Id.* at 586–87.

A court must consider three factors in determining equal protection challenges: (1) Does a class exist? (2) What is the governmental purpose of the legislation at issue? (3) Is the legislation rationally related to the objective? The state agrees that the Act creates a class comprised of licensed drivers under the age of nineteen. Next, the court must inquire as to what is the purpose of the challenged legislation. It is not disputed that the state has a valid interest in generally protecting and improving the safety of Wyoming roads and highways, as well as deterring the illegal possession of alcohol. The third equal protection inquiry is whether the statutes are rationally related to the objective. In this case the objective is to deter and punish underage drinking and drug use. The question is whether suspending the driver's license of one convicted of an alcohol or drug related offense is rationally related to deterring and punishing underage alcohol and substance abuse.

In the circumstance here the penalty applies even if no motor vehicle is involved with the offense. Appellants contend, therefore, that the penalty is not related to the offense in some situations. The purpose of the questioned statutes is to deter and punish underage alcohol and substance use; the penalty is the driver's license suspension. The question is: "Does the sus-

pension deter and/or punish underage alcohol and substance abuse?" It seems obvious that it does. Obtaining a driver's license is one of the most important events in a teenager's life. It elevates social status in the eyes of peers. It symbolizes freedom and power. It is a sign of responsibility and the beginning of breaking ties with one's family and being able to set one's own rules.

A case quite similar to this was recently considered in Pennsylvania. In *Commonwealth v. Strunk*, 400 Pa.Super. 25, 582 A.2d 1326 (1990), the court was presented with a case where the nineteen-year-old appellant was arrested for underage possession, consumption, transportation and purchase of an alcoholic beverage. Upon conviction, appellant's driver's license was suspended for ninety days. Appellant claimed, as in this case, that his drinking violation was not connected to the operation or possession of a motor vehicle, and that the license suspension was not rationally related to the state's interest in promoting the safe operation of motor vehicles. He contends that this violated his right to due process. *Id.* 582 A.2d at 1327.

The Pennsylvania court found appellant's claim to be without merit. "We find that the appellant has failed to introduce any evidence to establish that the statute is either arbitrary or irrational. [The statute] indeed represents a rational means of deterring and punishing underage consumption and possession of alcohol." *Id.* at 1330. The court also noted the importance of the driver's license privilege and why a license suspension is more effective as a deterrent than a monetary fine: "We recognize that a license to drive a car is an important privilege to youths. Their social status, their psychological and physical independence, and their ability fully to participate in peer group activity may all be implicated if this privilege is suspended." *Id.*

The threat of losing driving privileges is substantial and an effective deterrent and punishment. I think this court should have adopted the rule and rationale of *Strunk*.

The idea of suspending driver's licenses for non-vehicular offenses is not novel. The New Jersey Supreme Court upheld such a law twenty years ago in *State v. Smith*, 58 N.J. 202, 276 A.2d 369 (1971). In finding that suspension of a driver's license for possession of marijuana was permissible, the court observed: "It seems to us that addition of a temporary forfeiture of a driver's license to a stated fine or imprisonment as a preventative regulation clearly represents a reasonable exercise of the legislative power to impose limitations upon highway use." *Id.* 276 A.2d at 375.

It is apparent that the state has a valid interest in preserving the safety, health, morals, economic and social stability and general welfare of its citizens. The statutes involved here are rationally related to the legitimate state interests and do not deprive appellants of the equal protection of the laws. Accordingly, they do not violate either the United States or Wyoming Constitutions.

This court has recognized that the prohibition against special legislation does not mean that a statute must affect everyone in the same way; it only means that the classification contained in the statute must be reasonable, and that the statute must operate on all persons or property in the same or similar circumstances and conditions. *Mountain Fuel Supply Co. v. Emerson*, 578 P.2d 1351, 1356 (Wyo.1978). Article 3, § 27 of the Wyoming Constitution is not violated if there is a reasonable classification. *Nehring v. Russell*, 582 P.2d 67, 77 (Wyo.1978).

By enacting Wyo.Stat. § 31–7–126 and Wyo.Stat. § 31–7–128(f), the legislature reflected the policy of citizens of Wyoming to reduce drunken driving and highway fatalities. If the majority had approached this case as they should have, with the presumption that the statutes were constitutional, it could easily have justified a holding of constitutionality and upheld state policy; but that was not their wont. Driving has always been considered a privilege rather than a right; however, the majority, without saying so, has elevated this privilege to constitutional proportions. The ma-

jority has determined that the privilege of a few outweighs the policy of the state and its citizens in reducing fatalities and injuries on the highways.

In our society, we are obsessed with rights to the neglect of duties. A society cannot function if everyone has rights and no one has responsibilities. I would uphold the suspension of appellants' driver's licenses.